Matthew M. Levy, J.
These two matters, involving, at this time, consideration of a number of motions each, are basically actions brought under the Donnelly Antitrust Act (General Business Law, art. 22)..
The first (New York Movers Tariff Bureau) is a 1964 suit for civil penalties and for an injunction against 64 defendants. The second (Office & Loft Movers Association) is a criminal contempt proceeding based upon a 1940 consent decree issued by this court, and has been instituted against 12 respondents.
Two motions, brought on by the plaintiff and the defendants, respectively, in the first action, sought stays on the one hand of certain proceedings instituted by the defendants before the State Public Service Commission, and on the other, of the continuance by the plaintiff of this action. Both applications were denied by me. Appeals were taken to the Appellate Division. That court denied the defendants’ motion to dismiss the plaintiff’s appeal and denied the plaintiff’s motion for an interim stay of the proceedings before the Public Service Commission. These appeals to the Appellate Division are presently pending. The hearings before the commission have been completed and are presently undetermined. Another motion, by which the plaintiff sought a dismissal of the affirmative defenses contained in the answer of a number of the defendants, was denied by *228 me upon the ground that the service of an amended answer rendered the motion moot. No appeal was taken from my decision on this motion.
There remain for disposition in the first-named action:
(a) A motion by the plaintiff under CPLR 3211 (subd. [b]) to dismiss the six affirmative defenses contained in the amended answer; and
(b) A motion under CPLR 3024 (subd. [a]) by which five of the defendants seek a more definite statement of the complaint against them.
The motions to be disposed of in the second action are:
(c) The application by the plaintiffs to punish certain defendants for alleged violation of the decree;
(d) A cross motion by certain defendants to vacate the order to show cause obtained to bring on the preceding motion, upon the grounds that there is no basis set forth in plaintiffs ’ application for the granting of the relief sought, that such relief is barred by estoppel, Statute of Limitations, the primary jurisdiction of the Public Service Commission, and abatement, and a denial is interposed of the alleged charges of contempt;
(e) A cross motion by one defendant, under CPLR 3211 (subd. [a], par. 8), for dismissal of the plaintiffs’ application to punish, on the ground of absence of jurisdiction over the person of that defendant; and
(f) A motion by which the movant seeks a declaration that it is not a party to, and is not a proper party in respect of, the plaintiffs’ motion to punish.
(I)
THE NEW YORK MOVERS TARIFF BUREAU ACTION (1964)
(A)
THE plaintiff’s MOTION TO DISMISS THE SIX affirmative defenses.
In the first action above captioned, instituted by the State of New York, the 64 defendants are alleged to control and perform about 90% of all of the work in the moving and storage industry in the Commercial Zone of the City of New York and are charged with a conspiracy of price-fixing and monopolistic practices in violation of article 22 of the General Business Law. The six affirmative defenses interposed by the answering defendants (who are other than the Long Island Moving and Storage Association, Inc., Lionel E. Weeks, Jr., individually and as *229 president of the Moving Employers Association of Long Island, Creighton MeShane and Donald Hamilton),[1] and attacked hy the State, are as follows:
(1) That the action is barred by a three-year Statute of Limitations;
(2) That the action is barred by a six-year Statute of Limitations;
(3) That if the defendants performed any of the acts complained of, such performance was duly authorized by the authority of the Public Service Law of the State of New York as the same has been amended from time to time ;
(4) That the allegations of the complaint are based upon activities that are subject to regulation by and are within the jurisdiction of the Public Service Commisssion, which is authorized to regulate same under the Public Service Law of the State of New York;
(5) That the defendant Movers Tariff Bureau has brought a proceeding before the Public Service Commission for the approval of the agreements and practices which are the subject matter of the complaint, which approval, if granted, would exempt defendants from the proscriptions of the Donnelly Antitrust Act, and if said agreements and practices are approved, such approval will bar this action; and
(6) That the plaintiff is estopped from bringing this action.
ESTOPPEL; THE SIXTH AFFIRMATIVE DEFENSE.
I shall consider first the defense last pleaded — that of alleged estoppel on the part of the plaintiff.
The gist of this defense is that the operations of the defendant tariff bureau and of the office of impartial chairman (established under the collective labor agreement in the industry) have been openly conducted, since 1936 and 1955, respectively, with the full knowledge of the Attorney-General; that the Attorney-General was advised in advance of the proposed activities of the office of impartial chairman, which the Attorney-General has not previously challenged in any way; that, when section 63-i (subd. 3, par. [c]) of the Public Service Law was amended in 1955 (L. 1955, ch. 834) so as to include the New York City Commercial Zone under the article (3-B) relating to motor carriers of property, the Attorney-General publicly asserted that this would make the Donnelly Act inapplicable to that zone and would relieve certain movers therein from existing court decrees; and that the defendants have at all times relied *230 upon these statements of the Attorney-General and his failure to challenge the operations of the New York Movers Tariff Bureau and the office of impartial chairman.
As against this aspect of the motion, and in support of their affirmative defense, the defendants have cited, and urged upon me, the case of United States v. New Orleans Chapter, Associated Gen. Contrs. of America (238 F. Supp. 273 [U. S. Dist. Ct., E. D. La.]). This is the only precedent which has come to my attention as being arguably contrary to the contention that the defense of estoppel must be dismissed; and it is my view that the case is distinguishable from that at bar.[2]
Basically, I point out that, in holding that the Government was estopped, the court made it quite clear that its view depended upon the nature of the case before it — a criminal prosecution as such, which the present action before me plainly is not. The court said (pp. 279-280):
“ The general rule is that the doctrine of estoppel is not applicable against the government in criminal matters. The rule admits, however, of an important exception. ‘ The government is estopped in the enforcement of criminal laws only by some sound public policy, such as when its officers have induced or lured the defendant into the commission of a criminal act.’ [Citations omitted.] The facts here show that the government had in fact examined the activities of the Association, including the use of ‘ Bidding Bule C ’, which is now the basis for the alleged criminal violations of the antitrust laws. The antitrust laws are unchanged; the relevant part of the Sherman Act has not since been amended. And there was never any *231 effort by the Association to conceal from anyone its ‘ modus operand! ’ with reference to bidding procedures. The provision for ‘ single bidding ’ has been in the Association’s rules of procedure for better than a decade and was fully known to the government.
“Here the government’s acquiescence toward ‘ Bidding Rule C ’ following its earlier examination of the Association induced defendants to continue using that same bidding procedure in the interim. Any allegation that the activity formerly approved is now considered criminal cannot be countenanced. The Court cannot refrain from the observation that this attitude by governmental departments and their officials could impair confidence on the part of our citizens and taxpayers in their public institutions. Such an attitude could undermine proper respect for the government when encouragement of that respect, in accordance with the proper principles of law, is one of the prime duties of the federal court.”
And, on the motion for reconsideration, the court said that its “ invocation of public policy was thus considered proper in order to prohibit any allegation that the activity formerly investigated and unobjected to is now to be considered as criminal for purposes of retroactive prosecution” (238 F. Supp. 273, 282).
Moreover, while the ancient maxim — that “The King can do no wrong ” — is no longer strictly true or legally efficacious, it is my view of the existing law in this State that estoppel does not lie against the exercise by the State of its sovereign powers (see Matter of Rochester Tr. Corp. v. Public Serv. Comm. of State of N. Y., 271 App. Div. 406, 411; Matter of Hiltzik v. Weaver, 16 Misc 2d 629, affd. 7 A D 2d 1023). As stated by the Appellate Division in the Third Department, the ‘‘ sovereign powers of the State cannot be lost or barred by the passage of time or by any inaction on the part of the State. Neither can the State be estopped on any equitable grounds from exercising its sovereign powers” (People v. System Props., 281 App. Div. 433, 441, mod. on app. [without discussion of this point] 2 N Y 2d 330).
In Rubel Corp. v. City of New York (73 N. Y. S. 2d 813, 819, affd. without opn. 274 App. Div. 925) it was even said, in regard to powers of a municipality (although quite obviously not “ sovereign ”) that the “ failure of City officials to enforce possible rights * * * whether for a long period or a short one, may not be made the basis of an admission or estoppel resulting in possible loss to the public of the municipality’s rights.” And it is quite plain that the enforcement of the *232 antitrust laws and the sanctions in these laws is an exercise of the sovereign powers of Government (see United States v. Kohler Co., 9 F. R. D. 289, 290 [U. S. Dist. Ct. E. D. Pa.]).
In short, my resolution of this branch of the plaintiff’s motion is that it should be, and hereby is, granted, and the sixth affirmative defense is dismissed.
JURISDICTION OR PUBLIC SERVICE COMMISSION ; THE FOURTH AFFIRMATIVE DEFENSE.
Notwithstanding the Attorney-General’s vigorous and capably presented contentions to the contrary, it is my considered conclusion that the Public Service Commisssion has jurisdiction of the transactions and activities complained of, that an association such as the defendant New York Movers Tariff Bureau cannot now be held, as a matter of law, not to have standing before the commission, and that the court should defer to the primary jurisdiction of the commisssion, the province of which extends, at least as an initial matter, to the determination as to the standing before it of the defendant bureau. The State’s motion to dismiss the fourth affirmative defense is therefore denied. My reasons follow:
Section 63-cc of the Public Service Law (as added by L. 1964, ch. 693, eff. April 22, 1964) reads in part as follows:
“ 1. Any common carrier subject to this article and party to an agreement between or among two or more carriers relating to rates, fares, classifications, divisions, allowances, or charges (including charges between carriers and compensation paid or received for the use of facilities and equipment), or rules and regulations pertaining thereto, or procedures for the joint consideration, initiation or establishment thereof, may, under such rules and regulations as the commission may prescribe, apply to the commission for approval of the agreement, and the commission shall by order approve any such agreement if it finds that, by reason of furtherance of the transportation policy declared in section sixty-three-i of this article, the relief provided in paragraph seven should apply with respect to making and carrying out such agreement; otherwise the application shall be denied. The approval of the commission shall be granted only upon such terms and conditions as the commission may prescribe as necessary to enable it to grant its approval in accordance with the standard above set forth in this paragraph. * * *
‘ ‘ 3. The commission shall not approve under this section any agreement which it finds is an agreement with respect to a *233 pooling or division of traffic, or service, or of gross or net earnings, or of any portion thereof.
‘ ‘ 4. The commission shall not approve under this section any agreement which establishes a procedure for the determination of any matter through joint consideration unless it find that under the agreement there is accorded to each party the fee [should probably read “ free ”] and unrestrained right to take independent action either before or after any determination arrived at through such procedure.” * * *
‘[1] 7. Parties to any agreement approved by the commission under this section and other persons are, if the approval of such agreement is not prohibited by paragraph three or four, hereby relieved from the operation of the general business law-section three hundred forty, with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the commission.”
It is the Attorney-General’s position that the provisions of subdivisions 3 and 4 of said section 63-cc prohibit the Public Service Commission from approving the agreement filed by the New York Movers Tariff Bureau. A pooling agreement (subd. 3) was among those activities leading to the 1940 decree and, it is asserted, such an arrangement continues today. It is also alleged that the right of independent action (subd. 4) does not exist under the provisions of the collective labor agreement with Local 814 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, largely due to the operations of the stabilization committee and the office of impartial chairman, therein established. The defendants argue that these subdivisions are not applicable, and cannot operate to prevent commission approval.
My view is that, at least as an initial matter, such determination— the application or nonapplication of these statutory interdictions to commission approval of the agreement in question — is within the scope of the primary jurisdiction of the commission and, therefore, this court should defer to that jurisdiction. Were I to resolve this issue at this time, I would be acting in a manner inconsistent with my major determination in this matter — that the Public Service Commission does have jurisdiction, albeit its decision may not be final.
It is clear to me that the defendant carriers are subject to article 3-B of the Public Service Law. This action is brought under the provisions of the General Business Law (§ 340 ei seq.) and the essence of the complaint is the existence of agreements between and among carriers, such alleged agreements being of *234 the nature set forth in subdivision 1 of section 63-ec of the Public Service Law. It would appear, therefore, that the Legislature has given the Public Service Commission express jurisdiction to consider the alleged activities and transactions set forth in the complaint.
It is to be noted that the application before the Public Service Commission (Case No. 23332; § 63-ec) is denominated “ the application of the Bureau for itself and on behalf of its motor-common carrier members ”. And I hold, as I have said, that the New York Movers Tariff Bureau, Inc., has preliminary standing to apply to the commission for approval under section 63-cc. I so hold, notwithstanding that I have been unable to locate any relevant committee reports to or floor discussions in the sessions of the Legislature. Nor does the 1964 New York State Legislative Annual indicate any message by the Governor which sometimes accompanies his approval of a new law.
However, I do find a memorandum submitted in favor of the bill (Sen. Int. No. 3288, Sen. Print No. 3576) by State Motor Truck Associations, Inc., New York State Movers and Ware-housemen’s Association, Inc., New York Motor Carrier Conference, Inc., and the defendant New York Movers Tariff Bureau, Inc. That memorandum reads, in applicable part: ‘ ‘ And, finally this amendment would strengthen the authority of the Public Service Commission to regulate motor carriers under its jurisdiction in the area where it has been vested with primary responsibility and possesses the expertise required.” (N. Y. Legis. Annual, 1964, p. 421.)
Matter of Mulligan v. Murphy (14 N Y 2d 223, 226) following Matter of Hotel Assn. of N. Y. City v. Weaver (3 N Y 2d 206, 211) indicates the significance of suggestions of the administrative agency involved in respect of legislative enactments within the ambit of its functions. With this thought in mind, I note that the Public Service Commission considers such associations as the defendant bureau to have standing before it, and urged the 1964 amendment in question so that its view in that regard may be legally solidified. In a memorandum from the Counsel of the commission to the Counsel to the Governor, dated March 26, 1964, recommending approval of the bill adding section 63-cc to the Public Service Law, the reasons for the recommendation are given as follows:
“Notwithstanding the fact that New York had enacted its Motor Carrier Act in 1938, as, in effect, a duplicate of the federal Act (and the two have been kept generally consistent), no proposal to add a ‘ Reed-Bullwinkle ’ provision [49 U. S. C. A. sec. 5b, added June 17, 1948, c. 491, 62 Stat. 472.] in the New *235 York Law has (to my knowledge) ever been advanced until recently. No occasion for considering such has arisen, until recently. Tariff filing associations of intrastate motor carriers have long been in existence. Some 22 of them now function. Their status has been recognized by PSC. The bulk of the motor carriers operating in this state serve under agency tariffs filed with us by such associations. If they didn’t, PSC would be forced to extract individual filings from each trucker engaged in the business. Most are not experienced enough in the intricacies of tariffs, class rates, commodity rates, etc. to do so. Many simply could not afford to do so. And the difficulty that a shipper would encounter in attempting to ascertain the proper charge for a shipment interchanged between two or more motor carriers would be almost, if not absolutely, insurmountable.
‘[1] Within the past year or two the Attorney General has intimated that such associations representative of (a) the New York City household goods movers (b) the statewide motor carrier conferences and (c) others, may be in violation of Section 340 of the General Business Law (the Donnelly Act — our counterpart of the Sherman Act). It is reported that this state’s chief law enforcement officer does not feel that PSC’s acknowledgment of the existence and propriety of such associations serves to remove them from the impact of the Donnelly Act.
“ It is the sole purpose of this measure to solve that problem, by the same means as was followed in 1948 at the national level. Senate Intro. 3288 is nothing but an exact duplicate of the federal Reed-B ullwinkle Act, with such changes as are required to incorporate it in and relate it to the Public Service Law of this state. Thereby the Commission will be authorized to approve of such associations as meet the prescribed standards and thereupon such associations will be removed from the threat of prosecution by the Attorney General under the Donnelly Act. Thereby the status quo, which has existed in this state since 1938, will be maintained.” (Emphasis as in original.)
Because of the correlation between the Reed-Bullwinkle Act and section 63-cc of the Public Service Law it is, in my view, apposite to consider the Federal act on this question of the standing of such associations before the commission. It is to be noted at once that subdivision (3) of section 5b of title 49 of the United States Code and subdivision 2 of section 63-cc of the Public Service Law on this point are identically worded. They read, in relevant parts, and are thus made applicable to: “ Each conference, bureau, committee, or other organization established or continued pursuant to any agreement approved by the *236 commission under the provisions of this section * * * ”.
By order dated December 27* 1963, effective January 3, 1964, the Interstate Commerce Commission approved the (defendant) tariff bureau’s application under section 5a of the Interstate Commerce Act (being the Reed-Bullwinkle Act, U. S. Code, tit. 49, § 5b), thereby — as I see it — granting Federal antitrust immunity to the tariff bureau and its members.
Since there can be no question but' that the Public Service Commission has jurisdiction, and it appears to me that defendant New York Movers Tariff Bureau, Inc., does, indeed, have standing to make application before the commission for approval under section 63-ce of the Public Service Law, it is my view that this court should defer to the primary jurisdiction of the commission to consider the matters alleged in the complaint.
In United States Nav. Co. v. Cunard S.S. Co. (284 U. S. 474), the Supreme Court of the United States affirmed the dismissal of a bill in equity seeking to enjoin alleged violations of the Federal antitrust laws. There, as in the instant proceeding, the agreement in question was without the approval of the regulatory agency (the Shipping Board); the agreement had not been filed for approval. The court said (p. 485): “ The act is restrictive in its operation upon some of the activities of common carriers by water, and permissive in respect of others. Their business involves questions of an exceptional character, the solution of which may call for the exercise of a high degree of expert and technical knowledge. Whether a given agreement among such carriers should be held to contravene the act may depend upon a consideration of economic relations, of facts peculiar to the business or its history, of competitive conditions in respect of the shipping of foreign countries, and of other relevant circumstances, generally unfamiliar to a judicial tribunal, but well understood by an administrative body especially trained and experienced in the intricate and technical facts and usages of the shipping trade; and with which that body, consequently, is better able to deal.”
In support of the motion to dismiss the affirmative defenses, the plaintiff cites with particular emphasis the cases of United States v. Trans-Missouri Freight Assn. (166 U. S. 290) and Georgia v. Pennsylvania R.R. Co. (324 U. S. 439) stating, for example, that “ [s]ome of the price fixing operations and agreements alleged herein are parallel to those condemned in” those two cases. However, both of those cases predate the Reed-Bullwinkle Amendment, and are distinguishable on that relevant ground. As stated in a footnote (No. 11) to the opinion of the court in Pan American World Airways v. United *237 States (371 U. S. 296, 306): “ It should he noted that the result in Georgia v. Pennsylvania R. R. Co., supra, might today be different as a result of the Act of June 17, 1948, 62 Stat. 472, which gives the Interstate Commerce Commission authority to approve combinations of the character involved in that ease and give them immunity from the antitrust laws ”.
Moreover, in United States Nav. Co. v. Cunard S.S. Co. (284 U. S. 474, 487, supra) it was argued, as in the case at bar, that the agreement referred to in the bill of complaint cannot legally be approved. The court made short shrift of this contention, saying (p. 487): “it reasonably cannot be thought that Congress intended to strip the board of its primary original jurisdiction to consider such an agreement and ‘ disapprove, cancel, or modify ’ it because of a failure of the contracting parties to file it [for Board approval] as § 15 requires. * * * And whatever may be the form of the agreement, and whether it be lawful or unlawful upon its face, Congress undoubtedly intended that the board should possess the authority primarily to hear and adjudge the matter. For the courts to take jurisdiction in advance of such hearing and determination would be to usurp that authority.[3] Moreover, having regard to the peculiar nature of ocean traffic, it is not impossible that, although an agreement be apparently bad on its face, it properly might, upon a full consideration of all the attending circumstances, be approved or allowed to stand with modifications. ’ ’
, In Far East Conference v. United States (342 U. S. 570) the court dealt with a situation in which, although the basic agreement had been filed and had boon approved by the Federal Maritime Board, the dual-rate provision challenged by the Government had not been filed for approval. The court held that the matter should be initially submitted to the board, and Mr. Justice Frankfurter (for the court) made some significant remarks about the doctrine of primary jurisdiction. At pages 574 to 575, he said: “ in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regu *238 lation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.”
In Luckenbach S.S. Co. v. United States (179 F. Supp. 605 [U. S. Dist. Ct., D. Del.] affd. as to antitrust matters and vacated on other grounds 364 U. S. 280) plaintiff was an intercoastal water carrier, which unsuccessfully sought to enjoin the Interstate Commerce Commission from denying its petition for the suspension of proposed reduced railroad rates. Plaintiff alleged two factors as the basis for judicial consideration of the matter. They were, as noted by the court (179 F. Supp. 605, 610): “ (1) The independent applicability of the Sherman Act provision to regulate railroads remains unimpaired, for the I. C. C. has not been delegated power to enforce Sherman standards; and (2) The provisions of the Interstate Commerce Act, authorizing the Commission to relieve carriers from antitrust responsibility for collective rate-making procedures, does [do?] not immunize the so-called predatory practices alleged.”
The court, continuing at pages 610 to 611, said that “ Conceding plaintiff’s proffer for the purpose of discussion it does not resolve the fundamental issue presented, namely, the applicability of the primary jurisdiction doctrine.” A footnote (24) at this point reads: “ ‘ The doctrine of primary jurisdiction, or exclusive primary jurisdiction, or primary decision, or preliminary resort, or prior resort, is not a doctrine that governs judicial review of administrative action. In this important respect, it is altogether different from the doctrines of exhaustion and of ripeness, which govern the timing of judicial review of administrative action. The doctrine of primary jurisdiction determines whether the court or the agency should make the initial decision. * * * ‘ The doctrine of primary jurisdiction does not necessarily allocate power between courts and agencies, for it governs only the question whether court or agency will initially decide a particular issue, not the question whether court or agency will finally decide the issue. * * * ’ 3 Davis, Administrative Law Treatise, § 19.01, pp. 1-3 (1958).” (Emphasis in original.)
The text of the opinion continues: “Plaintiff misconceives the modern import of the concept.” And again by way of footnote (25) the court says (p. 611): “ ‘ The holding that the Board had primary jurisdiction, in short, was a device to prepare the *239 way, if the litigation should take its ultimate course, for a more informed and precise determination by the Court of the scope and meaning of the statute as applied to those particular circumstances. * * # ’ Federal Maritime Board v. Isbrandtsen Co., 1958, 356 U. S. 481, 498-499, 78 S. Ct. 851, 862, 2 L. Ed. 2d 926.”
Continuing, in the body of its opinion, at page 611: “ The recent decisional law, in conjunction with the legal literature strongly urges where an administrative board, particularly knoAvledgeable in a specialized area, has been established, preliminary resort to the body should be had if some phase of the matter in litigation is Avithin its exclusive jurisdiction.”
The court then referred to the opinion of Mr. Justice Frankfurter in the Far East case (supra) and quoted the last sentence therefrom quoted (supra), and continued, on page 611: “ The requirement of preliminary resort to administrative boards is imperati\7e to achieve maximum effectiveness from our judicial process. To bypass an agency peculiarly adapted in a particular field Avould be a complete economic and judicial Avaste. An integrated system necessitates that agency action precede court review where machinery has been created for this procedure. Especially is this true in the area of national transportation and other fully regulated industries.”
A footnote (28) at this point reads: “ ‘ * * * Accordingly, this Court consistently held that Avhen rates and practices relating thereto were challenged under the antitrust laws, the agencies had primary jurisdiction to consider the reasonableness of such rates and practices in the light of the many relevant factors including alleged antitrust violations, for otherwise sporadic action by federal courts would disrupt an agency’s delicate regulatory scheme, and would throw existing rate structures out of balance.’ United States v. R. C. A., 1959, 358 U. S. 334, 348, 79 S. Ct. 457, 466, 3 L. Ed. 2d 354.”
The court then held (p. 611) that “Application of the foregoing principles to the allegations of the complaint conclusively demonstrates the antitrust charges should be initially considered by the Commission.”
Carnation Co. v. Pacific Westbound Conference (336 F. 2d 650 [C. A. 9th], cert, granted 380 U. S. 905) was a treble damage action, brought under the antitrust laws, in which an unlawful price-fixing combination was alleged to have been entered into by two shipping associations. Unfiled agreements were involved, and the court upheld the primary jurisdiction of the Federal Maritime Commission, before which a proceeding Avas pending at the time of the court action. In its opinion, the court said *240 (p. 662): “ It seems to us to be wholly inappropriate that a court and jury should, while this proceeding still pends, inject themselves into this matter and undertake to say what portions of the existing agreement are good and what parts are bad.”
The court continued (p. 664):
“ The whole thrust of the complaint in this case is that the defendants entered into agreements which differ from or were modifications of their filed and approved agreements, such as their Agreement 8200; that the agreements so entered into were required by law to be filed with and approved by the Commission ; that this was not done; that pursuant to these unapproved agreements rates were agreed upon and fixed, and that in consequence of the failure to procure Commission approval, defendants were liable under the antitrust acts.
“ Cunard and Far East Conference, as we have noted, both hold that failure of approval does not affect the Commission’s primary jurisdiction. But even if it did, the question would remain as to whether what defendants did amounted to agreements which required Commission approval. And that is something for the Commission to decide. If it should decide that defendants have been acting under agreements which should have been filed, but were not, the Commission * * * could adjudge a violation of the Act * # *. And, of course, the Commission * * * might find the conduct of the defendants in respect to the rates mentioned in the complaint was wholly within and authorized by the filed and approved agreements. But in passing upon these matters the Commission must necessarily employ a specialized judgment and a determination of fact, policy and law, not within the conventional experience of a judge or jury.”
The court re-emphasized its concept of the applicability of the doctrine of primary jurisdiction by saying (pp. 666-667):
“ We must therefore conclude that what is involved here is the conduct of common carriers by water whose ‘ business involves questions of an exceptional character, the solution of which may call for the exercise of a high degree of expert and technical knowledge.’ (284 U. S. at 485, 52 S. Ct. at 250) There is first the question of what did the Conferences here actually do. This should be decided, it seems plain, by the Commission which has already entered upon such an inquiry. The next question is whether or not what was done was of such character to require the presentation for approval of a new agreement. Here we enter upon a matter ‘ well understood by an administrative body especially trained and experienced in intricate and technical facts and usages of the shipping trade.’ United States *241 Nav. Co. v. Cunard S.S. Co., supra, at p. 485, 52 S. Ct. at p. 250.
‘ ‘ And finally, under the decisions and the Cunará and Far East Conference cases, even if it should be held that a new agreement had been made here which required approval of the Board, the exclusive primary jurisdiction is in the Board and not in the district court.”
It is my view, therefore, as stated,' that the fourth affirmative defense should not be dismissed, and the motion to do so must be and is denied.
ABATEMENT; THE FIFTH AFFIRMATIVE DEFENSE.
It is quite clear, from the wording of subdivision 7 of section 63-cc, quoted supra, that, if the Public Service Commission approves the agreement, no action can be grounded upon activities of the defendants in consonance therewith which take place subsequent to such approval. The question remains, however, as to the extent of the retroactive effect, if any, of such approval. And that is the thrust of the plaintiff’s motion to dismiss the fifth defense interposed by the- defendants.
It is settled law that when the legislative body removes the prohibition against conduct previously held unlawful, criminal proceedings premised upon the unlawfulness of that conduct must abate. A recent decision to that effect is Hamm v. Rock Hill (379 U. S. 306) where the Supreme Court of the United States vacated the convictions under State law for alleged trespass arising from the protest conduct of “ sit-in ” participants. The ground of decision was that the Federal Civil Rights Act of 1964 (passed subsequent to the petitioners’ convictions and the affirmances thereof in the State courts) applied, and prevailed over the State laws, making the petitioners’ conduct no longer unlawful. The court said (pp. 312-314):
“ The doctrine [of abatement] found its earliest expression in Chief Justice Marshall’s opinion in United States v. Schooner Peggy, 1 Cranch 103, 110 (1801): ‘ But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional * * * I know of no court which can contest its obligation. It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns * * * [the law] ought always to receive a construction conforming to its manifest import * * *. In such a case the court must decide according to existing laws, and if it be necessary to set aside a *242 judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside. ’ * * *
“ The reason for the rule was stated by Chief Justice Hughes, in United States v. Chambers: 'Prosecution for crimes is but an application or enforcement of the law, and if the prosecution continues the law must continue to vivify it.' 291 U. S. 217, at 226. * * *
“It is apparent that the rule exemplified by Chambers does not depend on the imputation of a specific intention to Congress in any particular statute. None of the cases cited drew on any reference to the problem in the legislative history or the language of the statute. Eather, the principle takes the more general form of imputing to Congress an intention to avoid inflicting punishment at a time when it can no longer further any legislative purpose, and' would be unnecessarily vindictive. This general principle, expressed in the rule, is to be read wherever applicable as part of the background against which Congress acts.”
The opinion of the court continued with the statement, at page 316, that ‘ ‘ the principle of abatement is so firmly imbedded in our jurisprudence as to be a necessary and proper part of every statute working a repealer of criminal legislation.” Mr. Justice Clabk (who was speaking for the court) concluded by saying (p. 317): “ In short, now that'Congress has exercised its constitutional power in enacting the Civil Eights Act of 1964 and declared that the public policy of our country is to prohibit discrimination in public accommodations as therein defined, there is no public interest to be served in the further prosecution of the petitioners. And in accordance with the long-established rule of our cases they must be abated and the judgment in each is therefore vacated and the charges are ordered dismissed.”
The case of Baltimore & Ohio R. R. Co. v. New York, New Haven & Hartford R. R. Co. (196 F. Supp. 724 [U. S. Dist. Ct., S. D. N. Y.]) involvd per diem rental rates charged defendants by plaintiff for the use of plaintiff’s freight cars. Defendants had previously, before the Interstate Commerce Commission, challenged the agreement setting those rates, on the ground that there had been a denial of the “ right of independent action” guaranteed by section 5a of the Interstate Commerce Act (the Beed-Bullwinkle Amendment, U. S. Code, tit. 49, § 5b, subd. [6]), corresponding to New York Public Service Law, § 63-cc, subd. 4). The commission had held that there had been no deprivation of the “right of independent action”. Plaintiffs then sued in the District Court to recover the amounts claimed due for the per diem rentals, and defendants alleged, as *243 a defense, the same denial of the “ right of independent action ” as being in violation of the antitrust laws.
In discussing the antitrust charges, and the doctrine of primary jurisdiction, Chief Judge Byax had the following to say (p. 744):
“ While the complaint before the Commission did not in so many words charge a violation of the antitrust laws, whether the activities charged against plaintiffs, if found to exist, constituted a violation of these laws, was very much before the Commission in the hearings, in the briefs submitted by the complainants and in the arguments made and cases cited * * *.
“ The activities complained of before the Commission and here * * * are practically a carbon copy of each other; a claimed abuse of the procedures under the Agreement and a deprivation of the right of independent action which there should have impelled the Commission to withdraw its approval of Agreement No. 7 as in violation of Section 5a and which here should impel this Court to withhold enforcement of any per diem rates as in violation of Section 5a as well as of the Sherman Act.
‘ ‘ Whether these activities took place in fact, and whether they had the effect complained of, and whether they were in violation of the statutory policy of the ICA was the principal issue, litigated and controverted. It was upon a finding of their non-existence, and that the agreement was in conformity with Section 5a and that plaintiffs had done nothing illegal, that the final determination was reached [citation omitted],
“ Obviously, the Commission did not make a specific conclusion of law that plaintiffs were not in violation of the antitrust laws; it was not called upon to do so; and such a conclusion, even if within its power to make, would not be binding on a Court in which the issue was raised. (Cf. 28 U. S. C. § 1337.)
“ But the Commission does have jurisdiction to make factual findings on a matter peculiarly within its province — its specialized knowledge and experience — that plaintiffs were not engaging in activities which now in a different proceeding or suit are claimed to constitute a violation of the antitrust laws. [Citation omitted.] Not only are such factual findings an adjudication which we would be bound to accept as a basis from which to draw legal consequences (Far East Conference v. United States, 342 U. S. 570, 72 S. Ct. 492, 96 L. Ed. 576; United States Navigation v. Cunard SS, 284 U. S. 474, 485, 52 S. Ct. 247, 76 L. Ed. 408); but in addition they are findings which by reason of statutory grant (Section 5a (9)) serve to clothe the parties and their actions under the agreement approved, with immunity from prosecution under the antitrust laws.”
*244 This doctrine has also found expression in the opinions of out Court of Appeals. In People v. Oliver (1 N Y 2d 152) that court dismissed the first degree murder indictment against the defendant. When the alleged crime was committed, the defendant was 14 years of age. Subsequently, the Penal Law was amended to remove the acts of children under 15 from the category of crimes. In its opinion, the Court of Appeals (speaking through Fuld, J.) said (pp. 158-162):
“ On the other hand, when a criminal statute is repealed or a penalty reduced, different considerations are involved. In such a case, there is no problem of preserving private rights and liabilities; and, since the legislation is ameliorative, there is no danger of ex post facto oppression [citation omitted]. The question becomes, rather, whether the State should retain the right to punish offenses committed before the legislative change under the more stringent law then in effect.
“ * * # ‘ [SJaving clauses’ were inserted in repealing laws, in order to preserve the State’s right to prosecute offenses previously committed under the repealed statute. * * * These sections, however, like all provisions of the General Construction Law, are not to be applied when the * general object ’ of the statute, ‘ or the context of the language construed, or other provisions of law indicate that a different meaning or application was intended ’. (General Construction Law, § 110; see People v. Roper, 259 N. Y. 635.) They have been read by this court to ‘ provide merely a principle of construction ’, which governs ‘ In the absence of * * * contrary intent ’ and which applies ‘ with special force to statutes which otherwise would be ex post facto or would deprive persons of substantial rights.’ (People v. Roper, supra, 259 N. Y. 635.) And, indeed, where an ameliorative statute takes the form of a reduction of punishment for a particular crime, the law is settled that the lesser penalty may be meted out in all cases decided after the effective date of the enactment, even though the underlying act may have been committed before that date [omissions are as in the opinion of the court; citations omitted by me]. * * *.
‘[1] As to a mitigation of penalties, then, it is safe to assume, as the modern rule does, that it was the legislative design that the lighter penalty should be imposed in all cases that subsequently reach the courts.
‘[1] With these thoughts in mind, we turn to the present case. * * *
“ That the change accomplished is more fundamental than a mere reduction of punishment for a given crime, that it relieves children of 14 or less from criminal responsibility altogether, *245 does not affect its character as a legislative mitigation of punishment. Indeed, it furnishes additional basis for applying such a statute in all subsequent proceedings. It would be anomalous to give retroactive force, as the law does, to a legislative judgment reducing the penalty for a particular crime and to deny such effect to a judgment which dispenses with all penalty, stricti sensu, invoking only the corrective processes employed by the children’s court ” (emphasis added).
Although the instant proceeding is civil in nature, the principle discussed and applied in Hamm and in Oliver (supra) is in my view pertinent here. By section 341 of the General Business Law, violation of the Donnelly Antitrust Act is made a misdemeanor. By section 63-cc of the Public Service Law, the Public Service Commission is empowered to relieve parties to an approved agreement from the threat of criminal prosecution under section 341 of the General Business Law. Thus, section 63-cc is clearly an “ ameliorative statute ” (People v. Oliver, supra, p. 159).
The principle that proceedings based upon what is no longer unlawful activity must abate has also been articulated in civil eases. The United States Supreme Court, in the well-known case of State of Pennsylvania v. Wheeling & Belmont Bridge Co. (59 U. S. 421), held that that portion of the prior decree which had ordered that a bridge should be either elevated or removed was unenforcible, in view of the fact that Congress had subsequent to the decree passed an act declaring that the bridge was a lawful structure as it stood prior to the decree sought to be enforced. In Newton Rubber Works v. De Las Casas (198 Mass. 156) it was held that contempt would not lie for the performance of an act (the building of a dam by Metropolitan Park Commissioners), previously enjoined, where a subsequent enactment gave the Commissioners the authority to construct new dams and bridges, and the dam in question was built under the authority of, and in conformity with, that statute. In Minegar v. Minneapolis Fire Dept. Relief Assn. (126 Minn. 332) the court affirmed an order denying a petition seeking to hold the defendant in contempt, where the enforcement of the decree upon which the petitioner relied would have been inconsistent with a statutory change made subsequent to that decree. And, in Township of Avon v. Detroit United Ry. (211 Mich. 34), a contempt order was vacated where the statute in question was held to have given officials of the interurban railway the authority to put into effect a certain rate schedule, although they had previously been enjoined from charging rates approved by the Interstate Commerce Commission, both sets of rates apparently being in excess *246 of the rates fixed in the franchise contract between the railway and the towns through which it passed.
While no case directly in point has been cited by counsel or revealed by research, it is my conclusion that the cases above discussed sufficiently indicate that, in the instant matter, should the Public Service Commission approve the agreement, the present action might have to abate. However, I am of the opinion that abatement will result only in the event and to the extent that such approval is granted. Section 63-cc, by its very wording, has no ameliorative effect except as interpreted and applied by the commission in the exercise of the authority delegated to it by the Legislature. It is only when the commission has so determined, that conduct, otherwise arguably open to judicial condemnation, is insulated therefrom.
Further, even though commission approval would serve to render certain of the conduct herein charged immune from challenge, such activities might nevertheless be alleged as components of a conspiracy to achieve an unlawful end and the instant action is based on alleged conspiracy. As I see it, the practices immunized, if such practices are part of a conspiracy to achieve an unlawful end, would, by the loss of that immunity, be rendered unlawful — at least in that specific context. And, in a case involving the Reed-Bullwinkle Amendment the United States Court of Appeals for the District of Columbia said: “ Even though it should be found in the end that the practices as such have been validly immunized by section 5a approved agreements, nevertheless, if they are part of an effort by Railroads [defendants] in combination or conspiracy to eliminate the competition of Aircoach [plaintiffs], rather than used merely to meet that competition, the practices would be removed from the protection of section 5a(9). We do not think the Act or any agreement which has been approved under it can be construed as authorizing the use of such practices for the purpose of eliminating the competition of Aircoach ” (Atchison, Topeka & Santa Fe Ry. Co. v. Aircoach Transp. Assn., 253 F. 2d 877, 887, cert. den. 361 U. S. 930).
I hold, in short, that this court should defer to the primary jurisdiction of the Public Service Commission, for it is that agency which is charged by law with the responsibility for initial determinations in matters such as this. When the commission has acted, it is time enough for the court to proceed, and it will then be enabled to do so with a clear picture of the situation. That aspect of the motion, therefore, which seeks dismissal of the fifth affirmative defense is hereby denied, but with leave to renew in respect thereof, if appropriate, after *247 the determination of the commission upon the application of the defendant New York Movers Tariff Bureau for approval under section 63-cc of the Public Service Law.
LEGISLATIVE AND COMMISSION AUTHORIZATION; THE THIRD AFFIRMATIVE DEFENSE.
This phase of the motion involves the question whether each and every act alleged in the complaint, if performed by the defendants (or any of them), was authorized under the provisions of the Public Service Law.
That question, as I view it, is solely one of law and, as such, it is the courts, not an administrative agency, which must make the final determination of statutory authorization, or lack thereof, for the conduct alleged. Nonetheless, I deem it appropriate, and consistent with my views as outlined hereinabove, to defer initially to the regulatory agency here involved, the Public Service Commission. Such an agency has the power to consider antitrust charges related to its area of concern, and it should do so. (Luckenbach S.S. Co. v. United States, 179 F. Supp. 605, 610-611 [U. S. Dist. Ct., D. Del.], affd. as to antitrust matters and vacated on other grounds 364 U. S. 280, supra; Baltimore & Ohio R. R. Co. v. New York, New Haven & Hartford R. R. Co., 196 F. Supp. 724, 744 [U. S. Dist. Ct., S. D. N. Y.], supra; Carnation Co. v. Pacific Westbound Conference, 336 F. 2d 650, 666-667 [C. A. 9th], cert. granted, 380 U. S. 905, supra).
Accordingly, the plaintiff’s motion to dismiss the third affirmative defense is denied, with leave to renew after the determination of the Public Service Commission upon the pending application for approval under section 63-cc of the Public Service Law, of the defendant New York Movers Tariff Bureau. I deem it important to point out here that the denial of this aspect of the motion to dismiss does not have the effect of ousting this court of complete or final jurisdiction of the antitrust issues of law involved. Bather, it serves to assure that, in the event that the court subsequently does resolve those issues, it will be assisted in doing so by the informed and expert analysis of the Public Service Commission. The ultimate determination of the questions of law remains a function of the court, which will be aided, but not bound, by the determination of the commission.
“It is for the courts, not for administrative agencies, to determine what action is within or without the law. Accordingly courts will review challenged action of an administrative agency to determine if it is within the law, and they are not *248 bound by the agency’s determination of questions of law but will determine such questions for themselves” (1 N. Y. Jur., Administrative Law, § 190, p. 627). And, as said by the Appellate Division, Third Department, in its opinion on an appeal from a decision of the Unemployment Insurance Appeal Board: “In reviewing this case, therefore, we lay the decision [of the Board] alongside the statute and examine in what areas the decision moves in a field of law, and what areas in a field of fact. We are not, of course, bound by the board’s view of the law in the sense we are bound by its view of the facts; our function, rather, is to interpret the law as far as we go” (Matter of Dresher [Lubin], 286 App. Div. 591, 592).
STATUTES OE LIMITATION; THE EHtST AND SECOND AEEIBMATIVE DEEENSES.
In this action for an injunction under section 342 of the General Business Law, and for the recovery of a civil penalty under section 342-a of the General Business Law, the answering defendants assert three-year and six-year Statutes of Limitation. Their stated rationale for so doing is as follows:
“The only possible violations of the Donnelly Act alleged in the complaint which could be charged to defendants are those alleged to have occurred prior to the 1955 amendment. As shown above, the Public Service Law amendments of 1955 and 1964 rendered the Donnelly Act inapplicable with respect to practices and conduct which occurred thereafter as here charged to defendants.
“ Consequently, even though the defendants might be charged with alleged violations of the Donnelly Act which occurred prior to the 1955 amendment, all such acts would be effectively barred by the six year statute of limitations under CPLR sec. 213, subdivision 1, as well as by the three-year statute of limitations under Section 341, General Business Law.”
The 1964 amendment to the Public Service Law, as stated earlier herein, added section 63-ec to that statute and gave the commission the authority to make determinations immunizing agreements between and among carriers from the operation of the Donnelly Antitrust Act. That section and its operation and effect are fully discussed in the portion of this opinion dealing with my holding in respect of the primary jurisdiction of the commission, and there is no need than but to point that out here.
The 1955 amendment had the effect, as recognized herein-above, of extending the operation of article 3-B of the Public Service Law to the New York City Commercial Zone. The defendants go further and argue that the amendment itself *249 made the Donnelly Act inapplicable as to them, even to the extent of requiring such a judicial holding in limine. I do not agree. I hold that, absent a provision such as the 1955 amendment, section 63-cc would not apply here in any way. And it is my view that, in the case of the 1955 amendment, as in that of the 1964 amendment (as above set out), the questions of the applicability and effect of the statutory change are, in the first, instance, for the administrative body involved to determine.
On the issue of the validity of the first and second affirmative defenses the question remains: From what point is the period of limitations to be computed in the case at bar?
In the case of the State of Missouri ex inf. Taylor v. American Ins. Co. (355 Mo. 1053) decided in 1946, the court makes the following comment in discussing the issue involving the Statute of Limitations (p. 1122): “We are of the opinion that they [the overt acts] come squarely within the rule as contended for by the respondents, and as quoted above ‘ the date of the last proven overt act under such conspiracy, regardless of the date at which the original illegal agreement was made, ’ controls in such eases. Such [since?] respondents and relator agree that this is the correct rule of law, and since we also agree, it will serve no useful purpose to cite authority in support thereof. ’ ’
However, neither by way of citation of counsel nor research by the court has there been any disclosure of authority directly in point. I did find that the “ cases involving the running of limitations against so-called civil actions for conspiracy present a melange of inconsistent, irreconcilable, even contradictory statements of general ‘rules’ relating to the subject ” and that “ the general statements made in the connotation in question are couched in such imprecise terms that they are of scant meaning apart from the particular factual situations which called them forth.” (Ann. 62 ALR 2d 1369, 1385).
The annotation then proceeds (pp. 1386-1387):
“ Some notice should, however, be taken of at least the more important generalities which have been advanced regarding the running of limitations against civil actions for conspiracy. It has, for example, been variously said that in such a suit limitations begin from the last overt act done in pursuance of the conspiracy, from the last overt act causing damage to the plaintiff, from each overt act causing damage, or from the time injury occurs.
“ There is, clearly, considerable inconsistency as between some of the foregoing generalities. If limitations commence at the time of the last overt act causing damage, they cannot begin *250 at the time of each overt act causing damage. Similarly, if the statute begins to run from the last overt act done in pursuance of the conspiracy, and such act causes plaintiff no injury, they cannot begin to run from the last overt act causing damage.”
Even in the diverse and confused expressions adverted to, there does not appear to be any judicial opinion which asserts that the Statute of Limitations begins to run from the date of the commencement of the alleged conspiracy. And, since the present is not a civil antitrust suit instituted by a private party (but rather by the State in behalf of all of the people, seeking an injunction and punitive, not compensatory, damages), I hold that — at least on the issue of when the Statute of Limitations begins to run against the action — • actual damage or injury occasioned any person or business need not be alleged or shown and therefore is of no relevance in the determination of the question of limitation of time for the institution of suit.
In view of the apparent absence of authoritative precedent in point, I turn to a consideration of cases involving criminal conspiracy, which are, in my view, pertinent as an analog on this point, although the statute per se is not applicable.
Writing for the majority of the Court of Appeals in Matter of Doyle (257 N. Y. 244, 256) Chief Judge Cabdozo said: “ The suggestion is not ignored that conspiracy is a misdemeanor, not a felony, and that some of the inquiries have relation to acts or agreements more than two years old, as to which the Statute of Limitations may constitute a bar. A statute of limitations is equivalent to an act of amnesty when the crime erased by lapse of time is one standing by itself, and is not a clue to the commission of other crimes thereafter [citations omitted]. Clearly it is no such equivalent when the crime is a continuing conspiracy, unaffected by any limitation till the combination is abandoned (United States v. Kissel, 218 U. S. 601).”
And thus it is that, in People v. Hines (284 N. Y. 93), the Court of Appeals dismissed a criminal conspiracy count for the failure of the indictment to allege an overt act within the period of the statute of limitations. (See, also, People v. Gold Key Club, 2 Misc 2d 380, 383, mot. to dismiss app. granted 3 A D 2d 740.)
From this stance, therefore, I hold that the statute here does not commence running from the initial date of the conspiracy, but rather from the latest overt act committed in pursuance thereof — the gravamen of the instant action being a continuing and existing conspiracy, carried out by the performance of an overt act or acts.
*251 The conspiracy and activities charged in the instant complaint and detailed therein and in the affidavits and exhibits submitted on this motion, although said to commence in 1937, are alleged to continue to the present time. A reading of the pertinent portions of the complaint will suffice to make that abundantly clear.[4] In this context, moreover, I note that the Public Service Commission is currently considering an application, made by one of the answering defendants, for approval of certain of the activities presently being conducted.
The limitation contained in section 341 of the General Business Law (relied upon, as hereinbefore noted, by the defendants) relates solely to a criminal proceeding based upon a violation of the Donnelly Act, and is, therefore, not available as a bar to the instant action even were the last overt act in pursuance of the alleged conspiracy performed before the three-year period provided in that statute. Section 342-a upon which the cause of action for recovery of civil penalties is based, contains a limitation that “ The action must be brought within three years after the commission of the act upon which it is based”. And the six-year limitation contained in CPLB 213 (subd. 1) is the successor of the 10-year limitation contained in section 53 of the Civil Practice Act (governing suits where no other period is specifically prescribed by law) and it is applicable to an action for an injunction (People v. Minuse, 273 App. Div. 457, 458; Capita v. Port Washington Yacht Club, 11 Misc 2d 987).
Whether or not the activities alleged were or are lawful is a separate question. But it cannot be said — particularly when *252 the complaint is entitled to be liberally construed (CPLR 3026) — that they all took place wholly prior to August 24, 1961 (first affirmative defense, par. 10 of the amended answer), much less prior to August 22, 1958 (second affirmative defense, par. 11 of the amended answer). Accordingly, on the basis of all of the facts presented to me, the plaintiff’s motion to dismiss these defenses is granted. In the event that, upon the trial, the proof is to the contrary, the Justice then presiding, upon due motion during the trial, may well, as a matter of substance, reactivate the appropriate defense. (Cf. People v. American Ice Co., 120 N. Y. S. 443, 459-460.)
i (b).
defendants’ motion fob, mobe definitive statement OF COMPLAINT.
This brings me to the motion, pursuant to CPLR 3024 (subd. fa]), made on behalf of five of the defendants in this action, to compel the plaintiff to serve an amended complaint in which there would be pleaded more definite statements as to several of the allegations contained in the complaint as follows:
1. The dates during which it is alleged that the three individual movants served as members or directors of the defendant Tariff Bureau’s General Rate Committee.
2. The dates on or during which it is alleged the defendants McShane and Weeks acted as president of the defendant Moving Employers Association of Long Island.
3. The dates on or during which it is alleged that the defendant Hamilton acted as president of the defendant Long Island Moving and Storage Association, Inc.
4. The identity of and the acts and statements made by co-conspirators together with the individual moving defendants, or any of them, in furtherance of the offenses charged.
5. The specific dates and times when, and manner in which, it is alleged that the individual movants conspired, contracted, agreed, combined and arranged to achieve the major purposes set out in paragraph 13 of the complaint, and to do a number of the specific acts alleged in paragraph 14.
6. The specific dates and times when the corporate movants executed the collective labor agreement alleged in the complaint.
7. Specification as to which of the moving defendants are alleged to be members of the defendant Movers and Warehouseman’s Association of Greater New York.
The Attorney-General opposes the motion in that the moving defendants are seeking to engage in an out-of-season fishing *253 expedition by way of a pre-answer discovery, that the complaint adequately notifies the defendants of the charges against them, that they either already know the information they seek to elicit, or could obtain it by scrutinizing the record in the related contempt proceeding, and that the other defendants have in fact served an answer to the complaint.
The last contentions of the plaintiff are entirely without merit. Knowledge of the facts on the part of the defendants is not a ground for ignoring the mandate of the statute that the pleading itself shall contain “plain and concise statements” (CPLR 3014) [1] ‘ sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved and the material elements of” the cause of action (CPLR 3013). Nor should the defendants be burdened with a minute analysis of the voluminous record in another action or proceeding in order that they might properly respond to the complaint in this action. They are entitled to look at the pleading here itself, and not be required to journey beyond its four corners in order to be informed of the basic elements of the cause alleged against them. Nor is it relevant to the determination of this motion that other defendants may have seen it fit to and did answer the complaint. To answer, or to make a motion such as the instant one, is a matter within the judgment of counsel for each of the party defendants. However other counsel may view the matter, their choice of a course of action should have, and has, no effect upon the resolution of this motion. It is for the court to scrutinize the pleading when the issue is duly raised, as here, and to determine whether the attack on it is or is not meritorious.
CPLR rule 3024 (subd. [a]) provides that “ If a pleading is so vague or ambiguous that a party cannot reasonably be required to frame a response he may move for a more definite statement.” The five moving defendants contend that because of the number of defendants (see Castanon v. 620-62nd St. Realty Corp., 198 N. Y. S. 2d 588) and because of the period of time involved (see Symons Galleries v. Phillips, 15 A D 2d 890), the plaintiff should be directed to make the complaint more specific in respect of which allegations refer to which defendants and at what times. And I am aware that, in discussing when the motion for a more definite statement is appropriate, a recognized text on the new practice statute makes the following comment: “In an action against several defendants, one of the defendants may move for a more definite statement if it [is] not clear from the complaint which causes of action have been asserted against him. The motion is proper when *254 the complaint is so indefinite that the defendant is unsure whether an affirmative defense should be pleaded. Along the same lines, if the course of conduct between the parties has been extensive or the defendant’s business is complex and comprised of numerous similar transactions, it may be necessary to require the plaintiff to identify in his complaint the particular transactions he wishes to put in issue.” (3 Weinstein-Korn-Miller, N. Y. Civ. Prac., § 3024.05.)
True, there are some 64 defendants involved in these proceedings and the period of time covered is about 27 years; but it is clear that both causes of action are asserted against all of the defendants (including the 5 moving defendants), and it is equally clear that all of the allegations are directed and relate to all of the defendants, both in respect of conduct and of time.
Were the complaint vague or ambiguous in any material respect, my decision in Hanson v. Hanson (203 Misc. 396) might be urged upon me — although it should be noted that that was a jury case, which this is not. I hold that, in substance and effect, and in adequate express terms as well, the plaintiff has alleged that the defendants (including the 5 movants) have conspired from 1937 and “ continuing up to the date of the complaint ”. That is sufficient to apprise the defendants of the plaintiff’s claim and to enable them to serve a responsive pleading (Harrod Co. v. Dick Co., 194 F. Supp. 502).
In my view the moving defendants may properly be relegated here to the utilization of a demand for a bill of particulars, rather than have their motion for a more definite statement granted. In considering the choice between these remedies, I note the comment made by the same textwriters herein-before quoted — (3 Weinstein-Korn-Miller, N. Y. Civ. Prac., § 3024.08): ‘ ‘ Comparison of motion for more definite statement with bill of particulars. * * * Prior decisional law provides no clear indication whether the bill of particulars or the motion to make more definite is appropriate in a given case. The usual judicial formulation has been that the motion’s prime purpose is to assist the applicant in pleading, whereas the bill’s function is to amplify the pleadings, limit the issues, and to prevent surprise at trial. The cases show a lack of consistent application of this distinction, however, and it is to be doubted that the lines drawn by the courts were ever precise or meaningful. * * * In sum, when the nature and basis of a party’s pleading are sufficiently definite and clear to permit response, the motion is not available; a bill of particulars or disclosure should be used to ascertain any of the minutiae still missing.”
*255 That, as stated in the movants’ brief, some of them were very young infants in 1937, and therefore presumed unable then to engage in the alleged conspiracy, is not before me as a matter of factual proof, nor is it a matter that cannot be proved upon the trial if the issue is duly raised as to the date of the commencement of the conspiracy, its termination date, if any, the chronology of overt acts and events in regard thereto, and the participation of the defendants therein.
The motion is denied. It is my conclusion that, at least for the purpose of being able to respond thereto, the complaint sufficiently alleges the formation of the conspiracy and the overt acts on the part of the defendants in furtherance thereof, and the time, and these are set forth ivith clarity and specificity enough so as not to taint the pleading with the condemnation of vagueness and ambiguity.
(II)
THE OFFICE & LOFT MOVERS ASSOCIATION CONTEMPT PROCEEDING (1940 DECREE)
(c) THE PLAINTIFF’s MOTION TO PUNISH FOB CONTEMPT
(d) THE DEFENDANTS’ CBOSS MOTION TO VACATE THE OBDEB TO SHOW CAUSE BBINGING ON THE PLAINTIFF’S MOTION TO PUNISH FOR CONTEMPT
Invoking section 750 of the Judiciary Law, the plaintiff in this action (the People of the State of New York) has instituted a proceeding directed to 12 defendants herein to show cause why they should not be punished for contempt of the 1940 consent decree entered in this case. All but one of the defendants have cross-moved for an order vacating the order to show cause “ on the ground that there is no basis set forth in plaintiff’s application for the granting of the relief herein sought and denying in all respects plaintiff’s contempt motion The issues presented by these cross-moving defendants do not go to any alleged procedural or jurisdictional defects in the order to show cause or in its supporting papers but, rather, to the merits of the plaintiff’s application and the defendants’ substantive responses to the motion to punish. That being so, I shall consider the defenses and arguments raised in this cross motion when I discuss the motion in chief, and this I shall now proceed to do.
*256 DO THE CHARGES MADE BY THE STATE CONSTITUTE VIOLATIONS BY THE DEFENDANTS OF THE 1940 DECREE[1]?
The consent judgment, in substance, perpetually enjoins the defendants in this action from agreeing and conspiring together to maintain, regulate, determine or fix the prices for the service of moving office and loft furniture, goods, fixtures, machinery and equipment in this State; to agree in advance upon the amount to be bid on a particular job; to register prices with one another or with any central office or organization in advance of the submission of such bids to the public; to pay into a common fund any sum based upon the total value in dollars of business done by the respective defendants, which sum when divided equally among the defendants, shall have compensated them directly or indirectly for any act or omission which is or could be construed as in furtherance of any arrangement to impair or restrain competition, fix prices or to establish, create and maintain a monopoly; to coerce or intimidate or penalize any one who accepts any such business from the public below a price previously set by agreement between the defendants, or any of them, or any other; to coerce or penalize in any way any member or other person who fails to maintain any stated price in the business; to restrict or prevent competition; and to do any act or thing or from agreeing to any act or thing which is or may be in violation of article 22 of the General Business Law of the State of New York, in the service of moving office and loft furniture, goods, fixtures, machinery and equipment.
The defendants are charged with violations of the decree in that they “ did not adopt any antitrust compliance policy or program but, instead, continued, reinforced and expanded the monopolistic practices * * *. Following the dissolution of the defendant Office & Loft Movers Association, Inc., the central registry for estimates and contracts was transferred to the Moving and Storage Stabilization Committee and to the Office of Impartial Chairman with policing and enforcement-powers to secure adherence. The fixing of rates, terms and conditions with enforcement systems by the several trade associations and the Interstate Household Movers Tariff Bureau, Inc., and its successor, the New York Movers Tariff Bureau, Inc., continued. Classification of moving jobs was established, i.e., commercial, exhibit and installation, etc., each of which are monopolized by the large moving companies, including defend *257 ants herein. Thus, the large moving companies, representing about 2% of the carriers in the metropolitan area, have monopolized and control about 90% of the commercial moving work in the metropolitan area of the City of New York.” And it is alleged by the plaintiff that this [4]
[4] conspiracy is still being carried out and expanded through a network of several associations and agencies ’ ’, the operation of which continues the prohibited activities of: (a) establishment and continuance of a central registry for bids or estimates, (b) refraining from competition, (c) fixing prices for commercial moving work, with policing and enforcement to assure adherence and (d) the pooling of profits. While the allegations of the affidavit in support of the order to show cause are myriad, they actually delineate in detail the four general categories of activity just-stated.
I see no need at this time to enumerate and -specify the many items, covering numerous typed pages in the moving papers, by which the plaintiff details the data set forth in the charges of contempt. The Attorney-General alleges that the 44 price fixing and monopolistic practices of the moving and storage trust has [sic] resulted in the skyrocketing of prices and rates from about $6.00 to $25.00 per hour, introduced waste methods, and restrictive practices adversely affecting not only the consumer but government agencies and the business community, contrary to the public policy and public interest.”
It would seem that there should be no difficulty in resolving this contested issue in favor of the plaintiff — that the charges constitute violations of the injunction. But the defendants here so seriously and sincerely argued to the contrary that I have decided to discuss the basic points raised by them.
The defendants (other than Weissberger, who has raised a separate issue separately to be considered) have advanced the arguments that the provisions of a decree must be construed in light of the facts in the case in which the decree was originally made and that a criminal contempt proceeding based on general or indefinite provisions of a decree cannot stand. While accepting these broad propositions of law as being valid, I am not led to the conclusion which the defendants would have me draw therefrom — that the decree cannot support the instant proceeding.
Although not an antitrust case, and not a criminal contempt proceeding, what the United States Supreme Court said in McComb v. Jacksonville Paper Co. (336 U. S. 187, 191-193) in *258 respect of a decree which was allegedly too general is quite apposite here:
“As we have noted, the decree directed respondents to obey the provisions of the [Fair Labor Standards] Act dealing with minimum wages, overtime, and the keeping of records. There was no appeal from it. By its terms it enjoined any practices which were violations of those statutory provisions. Decrees of that generality are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown [citations omitted]. Respondents’ record of continuing and persistent violations of the Act would indicate that that kind of a decree was wholly warranted in this case. Yet if there were extenuating circumstances or if the decree was too burdensome in operation, there was a method of relief apart from an appeal. Respondents could have petitioned the District Court for a modification, clarification or. construction of the order. [Citation omitted.] But respondents did not take that course either. They undertook to make their own determination of Avhat the decree meant. They knew they acted at their peril. For they were alerted by the decree against any violation of specified provisions of the Act.
11 It does not lie in their mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined. Such a rule would give tremendous impetus to the program of experimentation with disobedience of the law which we condemned in Maggio v. Zeitz, supra, [333 U. S. 56] at 69. The instant case is an excellent illustration of how it could operate to prevent accountability for persistent contumacy. Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined. Hence a neAV decree is entered enjoining that particular plan. Thereafter the defendants work out a plan that Avas not specifically enjoined. Immunity is once more obtained because the neAV plan was not specifically enjoined. And so a whole series of wrongs is perpetrated and a decree of enforcement goes for naught.
“ That result not only proclaims the necessity of decrees that are not so narrow as to invite easy evasion; it also emphasizes the danger in the attitude expressed by the courts below that the remedial benefits of a decree Avill be withheld where the precise arrangement worked out to discharge the duty to pay which both the statute and the decree imposed was not specifically enjoined.”
*259 The only antitrust case cited in support of the defendants’ first proposition is that of Terminal R. R. Assn. v. United States (266 U. S. 17) from which the defendants submit an excerpt appearing at page 29. That quotation is as follows: “ In contempt proceedings for its enforcement a decree will not be expanded by implication or intendment beyond the meaning of its terms when read in the light of the issues and the purpose for which the suit was brought, and the facts found must constitute a plain violation of the decree so read.” (Emphasis added by me.)
It will be noted that one of the aids to interpretation of the decree is “ the purpose for which the suit was brought ”. This is a very significant consideration as to both of the points raised on this aspect of the motion, and the defendants seek to de-emphasize that factor in the presentation of the authorities relied upon.
As to the cases regarding decrees unenforcible by criminal contempt, which were cited by the defendants, all appear to me to be distinguishable on the basis of the specific fact situations giving rise to the suits, the majority are distinguishable in that “ the purpose for which the suit was brought ” is, in each of them, of a nature sufficiently different from the purposes of antitrust actions (including protection of the public) to render them inapplicable here (Waters of White Lake v. Fricke, 276 App. Div. 628; Porous Plaster Co. of Sing Sing v. Seabury, 48 Hun 620 opinion in 1 N. Y. S. 134; Matter of Mitchell v. Sperling, 229 App. Div. 204; Ketchum v. Edwards, 153 N. Y. 534; Lyon v. Botchford, 25 Hun 57; Sabbeth v. Sabbeth, 2 Misc 2d 64, affd. 3 A D 2d 649, mot. for lv. to app. dsmd. 3 N Y 2d 904, and Labor Bd. v. Express Pub. Co., 312 U. S. 426) and several do not involve criminal contempt (Sabbeth v. Sabbeth, supra; Labor Bd. v. Express Pub. Co., supra; Hartford-Empire Co. v. United States, 323 U. S. 386; B & C Truck Leasing v. Interstate Commerce Comm., 283 F. 2d 163 [C. A. 10th]; and Milk and Ice Cream Can Inst. v. Federal Trade Comm., 152 F. 2d 478 [C. A. 7th].
Labor Bd. v. Express Pub. Co. (312 U. S. 426, supra), not an antitrust case, does not, when the defendants’ quotations from it are read in fuller context, support the position for which the defendants advance it — that the decree here involved must be limited to the specific facts which gave rise to it. The court said (pp. 433-437):
“ But we think it does not follow that, because the act of respondent which the Board has found to be an unfair labor practice defined by § 8(5) is also a technical violation of § 8(1), *260 the Board, in the circumstances of this case, is justified in making a blanket order restraining the employer from committing any act in violation of the statute, however unrelated it may be to those charged and found, or that courts are required for the indefinite future to give effect in contempt proceedings to an order of such breadth. * * *
“It is obvious that the order of the Board, which, when judicially confirmed, the courts may be called on to enforce by contempt proceedings, must, like the injunction order of a court, state with reasonable specificity the acts which the respondent is to do or refrain from doing. It would seem equally clear that the authority conferred on the Board to restrain the practice which it has found the employer to have committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlatoful conduct. * * *
“ A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant’s conduct in the past. But the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged. This Court will strike from an injunction decree restraints upon the commission of unlawful acts which are thus dissociated from those which a defendant has committed. * * *
“It is a salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts. * * *
“Having found the acts which constitute the unfair labor practice the Board is free to restrain the practice and other like or related unlawful acts. * * * The breadth of the order, like the injunction of a court, must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the employer in the past. * * * And since we are in a field where subtleties of conduct may play no small part, it is appropriate to add that an order of the Board, like the injunction of a court, *261 is not to be evaded by indirections or formal observances which in fact defy it.” (Citations omitted; emphasis added.)
Hartford-Empire Co. v. United States (323 U. S. 386, supra) was an appeal from a decree enjoining antitrust violations. Although, as pointed out by the defendants, the court did vacate the decree, it made the following comments, which clearly show that the case does not really support the defendants’ position here: “ The applicable principles are not doubtful. The Sherman Act provides criminal penalties for its violation, and authorizes the recovery of a penal sum in addition to damages in a civil suit by one injured by violation. It also authorizes an injunction to prevent continuing violations by those acting contrary to its proscriptions. The present suit is in the last named category and we may not impose penalties in the guise of preventing future violations. This is not to say that a decree need deal only with the exact type of acts found to have been committed or that the court should not, in framing its decree, resolve all doubts in favor of the Government, or may not prohibit acts which in another setting would be unobjectionable. But, even so, the court may not create, as to the defendants, new duties, prescription of which is the function of Congress, or place the defendants, for the future, ‘ in a different class than other people,’ as the Government has suggested. The decree must not be ‘ so vague as to put the whole conduct of the defendants’ business at the peril of a summons for contempt ’; enjoin ‘ all possible breaches of the law ’; or cause the defendants hereafter not ‘ to be under the protection of the law of the land.’ ” (Pp. 409-410; emphasis added.)
And, in finding a particular provision [of the decree] inappropriate, the court said (p. 418): “ The earlier portion of the paragraph is vague and would be difficult of application. It seems not to be addressed to any practice indulged in or threatened by any of the appellants. It should, therefore, be modified or eliminated.” (Emphasis added.)
And, while the price-fixing case of Milk & Ice Cream Can Inst. v. Federal Trade Comm. (152 F. 2d 478 [C. A. 7th] supra) appears at first blush to support the position of the defendants, that case should be read as limited to the specific type of decretal provision there held defective. It Avas there said (pp. 483-484):
“ We are of the view, however, that one provision contained in paragraph (7) of the order should be eliminated. By it petitioners are enjoined from 1 formulating or putting into operation any other practice or plan Avhich has the purpose or effect of fixing or maintaining prices for metal milk or ice- *262 cream cans. ’ The present plan has been tested and found unlawful and we see no reason why some other plan of which the Commission might complain should not be tested in the usual way rather than in a proceeding for violating the cease and desist order, as would be the case if this provision should remain in the order. In Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518, the court eliminated from an injunction order a provision almost identical with the one under discussion. The court (196 U. S. at page 401, 25 S. Ct. at page 281) said: ‘ The general words of the injunction “ or by any other method or device * * *” should be stricken out. The defendants ought to be informed, as accurately as the case permits, what they are forbidden to do. Specific devices are mentioned in the bill, and they stand prohibited. The words quoted are a sweeping injunction to obey the law, and are open to the objection which we stated at the beginning, that it was our duty to avoid.’
“We think this reasoning is applicable to the provision in question and that it should be eliminated. ’ ’
It can readily be seen that both Milk & Ice Cream Can Inst. (supra) and Swift & Co., therein cited, deal with provisions of the widest scope, enjoining acts which might not be at all related to, or the threat of which might not reasonably be inferred from, the acts proven in the original action. It is my conclusion that the decree in the instant matter is not of that type.
The Fifth Circuit Court of Appeals in the civil contempt proceeding in Wirtz v. Ocala Gas Co. (336 F. 2d 236), while it was not an antitrust case, expresses views which are quite in point here. The case is particularly applicable, involving, as does the instant matter, a consent decree — which is another factor the defendants are prone to ignore on this submission. There it was said (p. 240): “Inasmuch as they [Fair Labor Standards Act injunctions] are a means of effecting general compliance with national policy expressed by Congress, they are to be utilized in the light of the purposes of the Act, in aid of the administrative efforts at enforcement, and not grudgingly. # * They should be issued in some instances even where the activity which gave rise to the litigation has been completed, where there is a likelihood that the violation will be resumed. * * * In view of the teaching of the cases that the courts should not be loath to issue these injunctions when needed, so also these decrees must be construed in the light of the purpose they are designed to serve. They may be sufficiently broad and general to enjoin any practices which would constitute *263 violations of the Act’s provisions dealing with minimum wages, overtime and the keeping of records. * * * Decrees of such generality are often necessary to prevent further violations. If a defendant perceives that a proposed decree is too general, he should not consent to it, and if it is entered without his consent, he should appeal therefrom or petition the District Court for a modification. * * * If a defendant acquiesces in a decree and undertakes to make his own determination of its meaning, having been alerted by it he acts at his peril. It is no defense to a civil contempt citation that the precise factual situation alleged to constitute a violation of the decree was not investigated or adjudicated at the original trial.” (Citations omitted.)
The same court, in National Labor Relations Bd. v. American Mfg. Co. (132 F. 2d 740), considered the point of the relation between the acts enjoined by a consent decree and the acts complained of in the enforcement proceedings. The pertinent comment of that court was as follows (p. 742): “As to the admitted matters, they defended on the grounds (1) that the acts complained of had no connection with, and no relation or similarity to, the acts and practices which brought about the former decree and which that decree sought to remedy * * *. We cannot agree with either of these positions. The first, that the scope of the decree, consented to by them, and long since become final, may now be limited short of its terms, is wholly without merit, for a decree entered with jurisdiction must be obeyed as entered. It may not be defied or disobeyed. Its terms are clear and comprehensive and if they read more broadly than respondent intended that they should, the time and manner of avoiding that breadth was by objections to the decree before its entry and not by disobedience of it afterwards.”
Even were we here at liberty to consider the fashioning of a decree, as distinguished from the enforcement of one already entered after contest or upon consent, I would not be persuaded by the defendants’ arguments or citations. On this point, I shall refer to two United States Supreme Court cases. Standard Oil Co. v. United States (221 U. S. 1) and Local 167 v. United States (291 U. S. 293) were both brought under the Sherman Act. In the Standard Oil case, it was said by the court (pp. 77-78): “ It may be conceded that ordinarily where it was found that acts had been done in violation of the statute, adequate measure of relief would result from restraining the doing of such acts in the future. Swift v. United States, 196 U. S. 375. But in a case like this, where the condition which has been brought about in *264 violation of the statute, in and of itself, is not only a continued attempt to monopolize, but also a monopolization, the duty to enforce the statute requires the application of broader and more controlling remedies. As penalties which are not authorized by law may not be inflicted by judicial authority, it follows that, to meet the situation with which we are confronted the application of remedies two-fold in character becomes essential: 1st. 'To forbid the doing in the future of acts like those which we have found to have been done in the past which would be violative of the statute. 2d. The exertion of such measure of relief as will effectually dissolve the combination found to exist in violation of the statute, and thus neutralize the extension and continually operating force which the possession of the power unlawfully obtained has brought and will continue to bring about.”
And, in the Local 167 case (supra, p. 299) the court said: “ The United States is entitled to effective relief. To that end the decree should enjoin acts of the sort that are shown by the evidence to have been done or threatened in furtherance of the conspiracy. It should be broad enough to prevent evasion. In framing its provisions doubts should be resolved in favor of the Government and against the conspirators.”
In the light of the authorities as I understand them and considering the broad beneficent purpose of antitrust prohibitions, actions and proceedings — the protection of the public — I hold that each of the provisions of the consent decree is sufficiently clear and definite to be enforcible by a contempt proceeding. Further, that the decree validly enjoins not only the specific-activities set out in paragraphs (a) through (d) thereof as the defendants contend, but, in addition, the conduct proscribed by the other paragraphs, which is clearly related to those specific acts and the prohibition of which is within the purpose and intent of antitrust actions.
In deciding, as I have, against the defendants on the issue of the applicability of the decree to their conduct at present, I do not, however, dispose of the motion to punish them for contempt nor of their cross motion to vacate the order to -show cause bringing on the contempt proceeding. There are still a number of objections in their arsenal of defense, and each must be separately considered. At this posture of my analysis of the case, let me point out that, as I read the documents before me, it seems that the essence of the allegations in support of the Attorney-General’s motion to punish and those submitted by the defendants in opposition thereto is basically the same in this proceeding as the substance of the allegations of the complaint and the defenses in the answer in the New York Movers Tariff *265 Bureau matter, hereinbefore considered. In the circumstances, much of what I shall now say will be by way of reference to earlier portions of this opinion.
ABB THE PLAINTIFFS ESTOPPED FBOM SEEKING TO PUNISH THE DEFENDANTS FOR VIOLATION OF THE 1940 DECREE ?
What I have said when I granted the State’s motion to dismiss the defense of estoppel to the recently commenced action under the Donnelly Antitrust Act, hereinbefore discussed, is fully relevant here. However, some comment is deemed necessary (or, at least, appropriate) in considering the applicability to the instant proceeding for criminal contempt of what I said regarding the affirmative defense of estoppel interposed in the suit for injunction and civil penalties.
One of the grounds upon which I distinguished United States v. New Orleans Chapter, Associated Gen. Contrs. of America (238 F. Supp. 273 [U. S. Dist. Ct., E. D. La.]) (reversed since citation by counsel, see footnote, supra) was that that was a criminal prosecution — which the case of State of New York v. New York Movers Tariff Bureau, Inc., et al., the companion matter now before me is not, but which the instant proceeding is closer to being.
DOES THE STATUTE OF LIMITATIONS BAR THE MOTION TO PUNISH FOB CONTEMPT 1
The three and six-year Statutes of Limitations (General Business Law, § 341 and CPLR 213, subd. 1) were invoked by the defenses to the newly instituted action by the Attorney-General. As an objection to the present motion to punish for alleged violation of the 1940 decree, the defendants rely upon the two-year Statute of Limitations set forth in section 142 of the Code of Criminal Procedure.
Interestingly enough, it appears that there is no express statute in this State limiting the time within which a proceeding for criminal contempt grounded upon the ‘ ‘ Wilful disobedience to its [the court’s] lawful mandate ” (Judiciary Law, § 750, subd. 3) may be instituted. Section 142 of the Code of Criminal Procedure is a part of title II, providing for “ the time of commencing criminal actions ”. The section, in the claimed pertinent part, states that “A prosecution for any misdemeanor other than a conspiracy to commit a felony must be commenced within two years after its commission ’ ’.[5] Recognizing that the statute, insofar as its express terms are concerned, applies to an action in which a defendant is prosecuted for the commission *266 of a crime, and not to a criminal contempt proceeding, the defendants cite the decision of the Supreme Court of the United States in Gompers v. United States (233 U. S. 604, 612) wherein Mr. Justice Holmes, for the court, says that “ Even if the statute[6] does not cover the case by its express words, as we think it does, still, in dealing with the punishment of crime a rule should be laid down, if not by Congress by this court. The power to punish for contempt must have some limit in time, and in defining that limit we should have regard to what has been the policy of the law from the foundation of the Grovernment. By analogy if not by enactment the limit is three years ”.
The plaintiff, on the other hand, urges that this court’s power to punish for contempt is not barred by limitations or lapse of time, citing, presumably as analogy, the civil contempt cases of Matter of Hay Foundry & Iron Works (22 App. Div. 87); Hayes v. Hayes (74 Misc. 533, revd. on other grounds 150 App. Div. 842); and Goodman v. Goodman (202 N. Y. S. 2d 897).
I need not resolve the issue as thus presented by counsel for, in my view, the purported defense is without merit on the facts. It will be recalled that I have hereinabove made clear my views as to the inapplicability of the three and six-year limitations as to the action in equity recently instituted by the State. A fortiori, I deem the two-year limitation as not applicable to the instant criminal contempt proceeding. As I have in substance stated — when I discussed the affirmative defenses pleaded to the new complaint — it is quite clear, from the papers submitted to me, that the allegedly contemptuous activities of the defendants have continued (at least until the time of the institution of this proceeding) on the basis of the conduct of the defendants and the operation of the Tariff Bureau and the Office of Impartial Chairman established in the collective labor agreement. This is well within the two-year period invoked by the respondents on this motion.
DO NOT THE CHARGES RAISE MATTERS THAT ARE THE SUBJECT OF THE JURISDICTION OF THE PUBLIC SERVICE COMMISSION, AND NOT WITHIN THE PURVIEW OF THE ENFORCEMENT PROCEDURES OF THE ATTORNEY-GENERAL UNDER THE DONNELLY ANTITRUST ACT?
Since the 1955 removal of the metropolitan zone exemption (Public Service Law, § 63-i, subd. 3, par. [c], L. 1955, ch. 834, eff. April 29, 1955), the commission has clearly had at least *267 some regulatory jurisdiction over the moving and storage industry in the New York City Commercial Zone. As the 1955 amendment extended the geographical area of commission jurisdiction, so the 1964 amendment (Public Service Law, § 63-cc), earlier discussed, made explicit the expansion of the ambit of that jurisdiction. The question now is whether that jurisdiction extends to the consideration of activities allegedly in violation of the antitrust laws of this State. The allegations here are essentially the same as those made in the complaint in the Tariff Bureau case — that the agreements and activities of the defendants are illegal under the Donnelly Act. There, as has been seen, the relief sought is an injunction and the recovery of civil penalties. Here, it is a ruling that the defendants are in contempt of the 1940 decree. But the facts alleged as the basis for the relief sought are the same in both instances.
Nothing presented by counsel in the instant matter persuades me that the conclusion there reached — that the commission has the power to consider antitrust charges related to the activity which that agency regulates, and that the courts should defer to the agency’s primary jurisdiction to resolve the issues — is inapplicable here.
Of course, the commission’s jurisdiction is a limited one in that it is primary — that is to say, initial, only — and, while it should be deferred to, does not render the Donnelly Act completely inapplicable. In consonance with my holdings herein-before made, ultimate jurisdiction is in the court. And that may be invoked by way of an article 78 proceeding under the CPLR to review the determination of the commission or by way of an application to the court to resolve the issue on the plaintiff’s motion to punish the defendants for contempt of the decree — such resolution to be made as a legal conclusion to be drawn from the appropriate facts found by the commission.
IF THE DECREE WERE TO BE ENFORCED BY CONTEMPT PROCEEDINGS WOULD THAT NOT IN EFFECT PROHIBIT WHAT THE STATUTE NOW AUTHORIZES AND THE PUBLIC SERVICE COMMISSION HAS POWER TO PERMIT ?
It is the position of the defendants that, due to subsequent changes in the Public Service Law, the 1940 decree can not now be enforced by a contempt proceeding. This specific contention has two bases: (1) that the Public Service Law authorizes the activities complained of and (2) that, by virtue of the 1964 addition of section 63-cc to the statute, the commission is empowered to immunize the defendants from Donnelly Act antitrust liability.
*268 The essence of this argument is that this criminal contempt proceeding is now abated because the decree has become functus officio. In regard to the applicability to the instant motion of what I have hereinbefore written, I must make some further comments.
It has been said that a ‘ ‘ proceeding to punish a defendant for disobeying an injunction order granted in a civil action may be either a proceeding to punish for a civil contempt or one to punish for a criminal contempt. (Koenig v. Eagle Waist Company, Inc., 176 App. Div. 724.) In either event, it is a special proceeding in a civil action. (People ex rel. Negus v. Dwyer, supra [90 N. Y. 402].)”, and that the “ mere fact that a contempt of a court of record which is willful is denominated criminal does not make the proceeding to punish it a criminal proceeding.” (Eastern Concrete Steel Co. v. Bricklayers' & Mason Plasterers' Int. Union, 200 App. Div. 714, 716, 717.) But it has also been pointed out that a contempt proceeding “ is quasi criminal in its character”. (People ex rel. Phillips v. Sutherland, 9 App. Div. 313, 315; see Matter of Stratton v. Wylie, 3 Misc 2d 518, 525.)
It would seem, therefore, that the instant proceeding is even closer to the analogy of the criminal cases than is the New York Movers Tariff Bureau action, and it is my view, as I have said, that a criminal contempt proceeding qualifies for the application of the principle of abatement. But I hold that the bar of abatement — while available in due time — has not yet reached the zenith of fruition.
In United States Nav. Co. v. Cunard S.S. Co. (284 U. S. 474, supra) the statute involved was the Shipping Act, which in substance requires that agreements between carriers providing for certain working arrangements be filed immediately with the Shipping Board, and that the board is thereupon authorized to approve, cancel or modify them to effectuate the purposes of the act. The court held (p. 486) that “ a failure to file such an agreement with the board will not afford ground for an injunction under § 16 of the Clayton Act at the suit of private parties — whatever, in that event, may be the rights of the government — since the maintenance of such a suit, being predicated upon a violation of the antitrust laws, depends upon the right to seek a remedy under those laws, a right which, as we have seen, does not exist here.”
In the case at bar I have specifically before me for disposition what the United States Supreme Court did not pass upon: the issue of the “rights of the government ” — here, the rights of the People of the State of New York — in a cognate situation.
*269 I am of the view that the Public Service Law, as amended, does not, without more, negate the rights of the State to the extent of ousting the Attorney-General of all of his responsibilities or this court of all of its jurisdiction in antitrust proceeding's under the Donnelly Act or in respect of the enforcement of its decrees issued thereunder. While the doctrine of abatement might subsequently become applicable in the instant matter — -the province of the commission having been invoked and its functions having been exercised — the Commission has not yet made its determination. It would be premature, therefore, to hold presently that the contempt proceeding must abate at this time.
On the other hand, since the commission has been conducting a proceeding which is all but awaiting decision on its part — one result of which will presumably be an informed and expert analysis of the facts, which would facilitate court determination of the legal conclusions to be drawn, and since, if commission approval of the bureau application be forthcoming, the 1940 decree might indeed become unenforcible by contempt because of the applicability of the doctrine of abatement, it seems equally premature to me to rule now upon the merits of the motion to punish for contempt. To characterize by ivay of condemnation or exculpation the conduct complained of — at this juncture — would be completely inconsistent with the entire judicial rationale of deferring to the primary jurisdiction of the administrative agency.
As a consequence, I shall defer decision on the plaintiff’s application to punish for contempt and the defendants’ cross motion to vacate the order to show cause — to await the determination of the Public Service Commission.
ii (e) and ii (f)
THE WEISSBEBGEB MOTIONS AS TO THE JUBISDICTION OF THE COUKT OVEB THE PEBSON OF THE DEFENDANT, AND THE STATUS OF THE MOVANT AS A FKOPEB PABTY.
One defendant, Weissberger Moving & Storage Co., Inc., has appeared specially and cross-moved to dismiss the contempt proceeding as to it on the ground of absence of jurisdiction over its person. A motion is also made by Weissberger Moving and Storage Co., Inc., seeking a declaration that it was not and is not a party to the earlier action and is not a proper party to the plaintiff’s motion to punish for contempt of the 1940 decree.
The thrust of each motion is that two separate corporations are involved, although they bear similar names[7] — one (the *270 “ old ”) a .party to the 1940 decree, and subsequently dissolved and allegedly inactive thereafter, the other (the “new”) recently formed and as transferee of the assets of the old company is currently engaged in the moving and storage business.
The basic contention of the Attorney-General on this issue is that- there is privity and scienter — continuity of management and operations, at the same address, with the same ownership, official personnel and activities, and full knowledge of the permanent injunction — in essence that the corporations are so closely related in fact and in conduct as to be deemed identical for the purposes of this contempt proceeding, notwithstanding dissolution, demise, transfers and other occurrences.
The movants deny any connection between the two companies and assert that the new company’s officers and managers are not the same as those of the old. The plaintiffs point out that in 1959 an application was made by both corporations to the Public Service Commission for transfer of certificate authorizing operation from the old corporation to the new, in which ■application the following response to the inquiry of the P. S. C. is made: “ Is there any financial or other relationship, direct or indirect, existing between the transferor and transferee ? [Answer] Yes.” “ If answer is ‘ yes,’ explain. [Explanation:] Persons in control of transferee also control transferor through stock ownership or otherwise.” And, again, in 1960 another application for transfer of a certificate from the old corporation to the new was filed with the commission, which application speaks of “ the continued management and operation of the Weissberger Company”.
These admissions are sought to be explained away by the movants in the following way: For a certain period subsequent to the transfer of assets of the old to the new corporation and the death of Harry Weissberger, his son Arnold (who is a principal in the new) became an officer of the old corporation, and this Avas for the sole purpose of 11 having a convenient signatory to any documents necessary to be signed in the winding up of the old corporation’s legal affairs ”, Avhich company the father had controlled prior to his demise. And that, when read in context, the statements in the applications filed with the Public Service Commission for transfer of certificates may as well relate to the winding up of the Harry Weissberger estate and the dispersal of the activities of the old corporation, as to the admissions of the continuity which the Attorney-General seeks to establish.
The principal affiants in support of the movants’ assertions are interested witnesses and their affidavit testimony in this *271 respect requires factual sifting and judicial scrutiny upon a hearing (cf., on motions for summary judgment: Newman v. Newark Fire Ins. Co., 281 App. Div. 852; Dube v. Cromwell Drug Co., 284 App. Div. 1040, mot. for lv. to app. den. 285 App. Div. 807). Moreover, the materials presented, pro and con, have created a cloud of dense smoke, and it is necessary that a hearing be had, in order to dissipate that cloud and permit the court to see with clarity that which lies beneath.
CONCLUSION
The motions and cross motions are severally disposed of in accordance with my determinations in the foregoing memorandum. Let separate orders be settled on each motion reciting all of the papers (including the exhibits) presented thereon.

. These are the five defendants who have separately appeared and moved for a more definite statement of the complaint.

. In ascertaining the precise relevance of that ease (so strongly relied upon by the defendants) to the instant matter, it should be noted, that, there, the thoroughness of the investigation made by the Government was taken by the court as established, a statement to that effect having been contained in a letter from defendants’ counsel to Government counsel, and introduced into evidence by the Government. Here, on the other hand, there is no such investigation alleged by the defendants — merely the letter advising the Attorney-General of the proposed operation of the office of impartial chairman, the public statement of the Attorney-General in 1955, and, it is claimed, openly conducted operations by the defendants. Further, in the General Contractors case, just referred to, it was found that there had been no concealment of the modus operandi of the defendants; here that point is strongly contested.
Were that all, there would have to be a hearing in this court, as a tribunal of law, to determine on the facts whether there should or should not be an estoppel. But, as hereinafter stated in the text of this opinion, that is not all.
(Since the preparation of my opinion, it has come to my attention that the Supreme Court of the United States on October 11, 1965, has reversed the decision in that ease. (U. S. Law Week, Oct. 12, 1965, p. 3103.) That court’s opinion, if any, is not presently available to me.)

. As I see it, the plaintiffs’ contention in the ease at bar — that the administrative body does not have primary jurisdiction — is considerably weaker than it was in the cited ease, for here there has already been a hearing held before the commission, a stay of which was denied by this court and the Appellate Division.

. “ eleventh : Beginning about 1937, the exact date being unknown to plaintiff, and continuing up to the date of this complaint, the defendants and eo-eonspirators did and still continue to * * *.
“ twelfth : Beginning about 1937, the exact date being unknown to plaintiff, and continuing up to the date of this complaint, the defendants and co-conspirators attempted to * * °.
“ thirteenth : The aforesaid conspiracy * * * consisted of a continuing unlawful agreement ” to fix “ rates, terms and conditions for the transportation and storage ” of certain goods, to “ monopolize the business ”, to “ allocate classifications ” and “ territories ”,
“ fourteenth : Pursuant to and in furtherance of the aforesaid conspiracy, contract, agreement, combination and arrangement, defendants and the co-conspirators did, among other things, the following: a a * [20 paragraphed items].
“ fifteenth : The effects of the aforementioned conspiracy, contract, agreement, combination and arrangement have been and are, among others: * M *
“ sixteenth : The aforementioned conspiracy, contract, agreement, arrangement and combination was and is illegal, contrary to public policy and in violation of General Business Law, sec. 340, and the common law of the State of New York * * L” (Emphasis supplied.)

. As to a conspiracy to commit a crime being a misdemeanor, see Matter of Davis v. Hults (24 Misc 2d 954, 957).

. The court cites the Federal statute as follows (p. 607) : “‘No person shall be prosecuted, tried, or punished for any offense, not capital, except * * *, unless the indictment is found, or the information is instituted within three years next after such offense shall have been committed.’ Rev. Stat., § 1044. Act of April 13, 1876, e. 56, 19 Stat. 32.”

. The nominal difference is that the “old” company used an ampersand (“&”) in its name and the “new” company uses the word “and” spelled out.