336 F.2d 236
 W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,
v.
OCALA GAS COMPANY, Inc., West Florida Natural Gas Company, Inc., Gulf Natural Gas Corporation and H. M. Lewis, Appellees.
 No. 20556.
 United States Court of Appeals Fifth Circuit.
 September 2, 1964.
 Rehearing Denied November 13, 1964.
 
 Bessie Margolin, Assoc. Sol. of Labor, Beate Bloch, Charles Donahue, Sol. of Labor, Robert E. Nagle, Warren M. Laddon, Attys., U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., for appellant.
 J. McHenry Jones, Pensacola, Fla., Hugh R. Dowling, Albert S. C. Millar, Jr., Austin, Basford & Millar, Jacksonville, Fla., for appellees.
 Before RIVES and JONES, Circuit Judges, and BOOTLE, District Judge.
 BOOTLE, District Judge:
 This appeal by the Secretary is from the District Court's dismissal of a petition to have West Florida Natural Gas Company, Inc., Gulf Natural Gas Corporation, and H. M. Lewis, hereafter referred to as Appellees, adjudged in civil contempt for violations of a consent decree entered by the District Court on January 2, 1959.
 The original injunction suit was filed on October 6, 1958, against Ocala Gas Company, Inc. (hereafter Ocala) seeking to enjoin violations of Sections 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act. The Secretary alleged that Ocala employed approximately 18 employees in and about its place of business, many of whom were engaged in commerce and in producing goods for commerce; that Ocala had violated, and was violating, Sections 6 and 15(a) (2) of the Act by paying several of these employees less than the minimum wage and had repeatedly violated Sections 7 and 15(a) (2) of the Act by employing several of its employees for workweeks longer than 40 hours, without compensating them for the overtime work; and that Ocala, an employer subject to the Act and record-keeping requirements thereof, violated Sections 11(c) and 15(a) (5) of the Act in that it had failed to make, keep and preserve adequate records of its employees and the wages, hours and other conditions and practices of employment maintained by it as prescribed by the Secretary's regulations. Ocala waived answer and any defense and consented to judgment, which was entered January 2, 1959.[1] Consent to this judgment was signed by H. M. Lewis, as President of Ocala.
 At the time of the entry of the consent decree, and prior thereto, Ocala was engaged in Ocala, Florida, and the surrounding counties in the business of operating a butane-propane air-mixing manufacturing plant, selling butane-propane gas to consumers through a gas distribution pipeline system in the City of Ocala, selling LP (liquid petroleum) gas in tank trucks and containers, and selling gas appliances. Ocala was a wholly-owned subsidiary of West Florida Natural Gas Company, Inc. (hereafter West Florida Gas), which also wholly owned several other subsidiary corporations throughout the State of Florida. Mr. H. M. Lewis was also President of West Florida Gas and his family has always owned a majority of the stock in this parent corporation. As explained by Mr. Lewis, "we control the company."
 On June 30, 1959, six months after the consent decree, Ocala was merged into Gulf Natural Gas Corporation (hereafter Gulf).[2]
 The parent corporation, West Florida Gas, planned to convert the butane-propane air gas system in Ocala, Florida, to natural gas and also to install a natural gas system in Panama City, Florida. These plans were afoot as far back as the date of the consent decree. This planned expansion involving an extension of the pipeline system in Ocala, Florida, and the construction of a brand new pipeline system in Panama City, Florida, required outside financing, as West Florida Gas had a very thin equity position and was unable on its own to raise the funds necessary to construct the two systems. As a means of facilitating the financing, Ocala was merged into Gulf.[3] After the merger, the operations of Gulf in Ocala, Florida, were known as Gulf Natural Gas Corporation, Ocala Division (hereafter Gulf Ocala) and the operations of Gulf in Panama City, Florida, were known as Gulf Natural Gas Corporation, Panama City Division (hereafter Gulf Panama). Gulf Ocala continued the same butane-propane air gas distribution business in which Ocala had formerly engaged until Gulf Ocala's existing pipeline system was converted to natural gas in July 1959. Gulf Panama began operation of its new natural gas system in February 1960, but the system was not complete until May 1960. Concurrently with the Gulf Panama operation, and prior thereto, West Florida Gas was engaged in selling bottled LP gas in Panama City, Florida. West Florida Gas also maintained an administrative building in Panama City. This building contained a central warehouse which, along with the administrative office, served all subsidiaries of West Florida Gas, except Gulf Ocala.[4] All of the employees who worked for Gulf Panama were employed by West Florida Gas and all equipment used by Gulf Panama was owned by West Florida Gas. West Florida Gas would apportion the cost of the employees and facilities and make an appropriate charge to Gulf Panama. The Gulf Ocala operation, and before that the Ocala operation, was independent, with full power and authority to hire, fire and set rates. Mr. Lewis explained this independence as resulting from the fact that Ocala, Florida, was too far away from the administrative office in Panama City. Gulf Ocala received its LP gas and appliances direct from the producers. At no time has West Florida Gas or Gulf Panama operations at Panama City consisted of a butane-propane air manufacturing plant.
 On June 29, 1962, the Secretary filed a petition for adjudication of Appellees, West Florida Gas, the parent corporation, Gulf and Mr. H. M. Lewis, President of both corporations, in civil contempt. This petition for adjudication is concerned only with the employees working in Panama City from January 1, 1960, to May 1, 1961, on Gulf Panama's natural gas system. The Secretary alleges that all three of the respondents, with full knowledge of the consent judgment entered January 2, 1959, have failed to comply with the Act and the consent decree in several particulars: First, in failing to pay some of the employees who were covered by the Act the minimum wage; second, in failing to pay some of the employees who worked more than 40 hours per workweek at the correct overtime rate; and third, in failing to make, keep and preserve adequate and accurate records.
 The primary defense urged by the Appellees in their several motions to dismiss and answer to the Secretary's petition is that the consent decree was concerned only with employees working in Ocala, Florida, for Ocala, whereas, the present petition is concerned only with employees working in Panama City, Florida, on Gulf Panama's natural gas system, who have never been adjudicated by a court to be covered by or subject to the Act; and that said employees working in Panama City, Florida, are not covered by the decree. There is no claim by the Secretary of any violations by Gulf Ocala. Appellees did not dispute the Secretary's contention that the employees here involved were not paid in accordance with the Act during the period in question, but assert that these employees were not within the Act's coverage, and even if covered, were exempt under Section 13(a) (2), the retail establishment exemption.
 Not reaching the coverage or exemption questions and addressing himself to what he described as "an awfully close point," the District Court dismissed the petition on the ground that the Panama City employees of West Florida Gas, Gulf Panama, and H. M. Lewis, individually, "were not covered by the Order of this Court, dated January 2, 1959, and since this action is brought only with respect to these Panama City employees, respondents did not violate said order."
 These Fair Labor Standards Act injunctions are not excessively burdensome as this court has pointed out heretofore. They subject the defendants to no penalty or hardship. They require no more than that the defendants comply with the law. Mitchell v. Pidcock, 299 F. 2d 281, 287 (5th Cir. 1962). Their aim is remedial and not punitive. McComb v. Jacksonville Paper Company, 336 U.S. 187, 193, 69 S.Ct. 497, 93 L.Ed. 599, 605 (1949). Inasmuch as they are a means of effecting general compliance with national policy expressed by Congress, they are to be utilized in the light of the purposes of the Act, in aid of the administrative efforts at enforcement, and not grudgingly. Lenroot v. Interstate Bakeries Corporation, 146 F.2d 325, 327 (8th Cir. 1945); Mitchell v. Southwest Engineering Company, 271 F.2d 427, 432 (8th Cir. 1959); Mitchell v. Pidcock, supra. They should be issued in some instances even where the activity which gave rise to the litigation has been completed, where there is a likelihood that the violation will be resumed. Hecht Company v. Bowles, 321 U.S. 321, 327, 64 S.Ct. 587, 88 L.Ed. 759 (1944); McComb v. Wyandotte Furniture Co., 169 F.2d 766, 770 (8th Cir. 1948); Chambers Construction Company v. Mitchell, 233 F.2d 717, 725 (8th Cir. 1956); Mitchell v. Southwest Engineering Company supra. In view of the teaching of the cases that the courts should not be loath to issue these injunctions when needed,[5] so also these decrees must be construed in the light of the purpose they are designed to serve. They may be sufficiently broad and general to enjoin any practices which would constitute violations of the Act's provisions dealing with minimum wages, overtime and the keeping of records. McComb v. Jacksonville Paper Company, supra at 336 U.S. 191, 69 S.Ct. 497, 93 L.Ed. 599.[6] Decrees of such generality are often necessary to prevent further violations. If a defendant perceives that a proposed decree is too general, he should not consent to it, and if it is entered without his consent, he should appeal therefrom or petition the District Court for a modification. See Regal Knitwear Co. v. National Lab. Rel. Bd., 324 U.S. 9, 15, 65 S.Ct. 478, 89 L.Ed. 661, 667 (1945). If a defendant acquiesces in a decree and undertakes to make his own determination of its meaning, having been alerted by it he acts at his peril. It is no defense to a civil contempt citation that the precise factual situation alleged to constitute a violation of the decree was not investigated or adjudicated at the original trial. McComb v. Jacksonville Paper Company, supra at 336 U.S. 191, 192, 69 S.Ct. 497, 93 L.Ed. 599.
 We cannot subscribe to the view that under the facts of this case the decree rendered was geographically confined to the Ocala, Florida area, and was not broad enough to apply to future activities at Panama City, Florida. It expresses no geographical limitations. It refers to "any of its employees engaged in commerce and in the production of goods for commerce." It would be unsound thus to limit the geographical scope of this particular decree. This is so because at the time of its rendition, H. M. Lewis, Ocala and West Florida Gas, all three, to the knowledge of the Secretary, contemplated switching to natural gas at Ocala, Florida, and installing a natural gas system at Panama City, Florida.[7] This type injunction is frequently granted against construction companies, whose work sites necessarily change from time to time. We doubt that it would be contended that in such case an injunction in broad language like that in the decree under consideration would be applicable only to the particular job or job situs giving rise to the injunction suit. In such cases, it is contemplated that the scene of activity will change. In Chambers Construction Company v. Mitchell, supra 233 F.2d at 725, the court observed:
 "Here, though the Beatrice [Nebr.] job [which gave rise to the injunction suit] has long since been finished, the business and operations of the defendants continue unchanged. They are still engaged in the same contracting work at places in Nebraska and Iowa where jobs arise from time to time."[8]
 In the case of Tobin v. Frost-Arnett Co., 34 Labor Cases ¶ 71,220 (W.D.Tenn. 1958), aff'd per curiam, 264 F.2d 246 (6th Cir. 1959) an injunction had issued against further violations when the employer was a Tennessee corporation, having its principal office in Nashville, with a branch office in Memphis. Thereafter, a separate corporation was formed to operate the Memphis office and three additional corporations were formed to operate similar offices opened in Atlanta, Knoxville and New Orleans. In subsequent contempt proceedings, the employer was required to make restitution of underpayments to employees working in all of the locations, thus negativing the idea that the injunction was to be interpreted as limited to the particular employees employed, or particular locations in existence, at the time of its issuance. Employees of four new corporations were made beneficiaries of the decree, although the employees of three of the new corporations were far removed from the locale of the operations as they were carried on at the time the decree was issued.
 The fact that Ocala merged into Gulf with Gulf continuing the operation at Ocala, Florida, and instituting the new and similar operation at Panama City, Florida, does not immunize these two operations from the decree. The operative force of the decree is not dependent in all instances upon the preservation of the corporate entity or structure of a defendant. In Walling v. Reuter, Inc., 321 U.S. 671, 674, 64 S.Ct. 826, 828, 88 L.Ed. 1001, 1004 (1944), the Supreme Court in assessing the reach of a Fair Labor Standards Act injunction said:
 "The judgment rendered by the District Court determined, subject only to resort to the prescribed appellate review of the judgment, the right of the administrator to an injunction restraining the corporation and those associated or identified with it from violating the statute. Not only is such an injunction enforcible by contempt proceedings against the corporation, its agents and officers and those individuals associated with it in the conduct of its business, * * * but it may also, in appropriate circumstances, be enforced against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons. The vitality of the judgment in such a case survives the dissolution of the corporation defendant. * * * And these principles may be applied in fuller measure in furtherance of the public interest, which here the petitioner represents, than if only private interests were involved."
 In Wiley v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Supreme Court held that a corporate employer must arbitrate with a union under a bargaining agreement between the union and another corporation which had merged with the employer. There the contracting employer had disappeared into another by a merger and the surviving corporation was held under the duty to arbitrate. The Court called attention to the general rule that in the case of a merger, the corporation which survives is liable for the duties and contracts of the one which disappears, citing 15 Fletcher, Private Corporations (1961 rev. ed.), § 7121.
 The views we here express are not out of harmony with cases arising under the National Labor Relations Act and holding obligations to bargain and decrees enforcing orders of the National Labor Relations Board binding upon successors in title to the original employers where the employment enterprise remains essentially the same. See N.L.R.B. v. Alamo White Truck Service, Inc., 273 F. 2d 238, 239 (5th Cir. 1959); N.L.R.B. v. Auto Ventshade, Inc., 276 F.2d 303 (5th Cir 1960); N.L.R.B. v. Tempest Shirt Manufacturing Company, 285 F.2d 1 (5th Cir. 1960); Reynolds Pallet and Box Company v. N.L.R.B., 324 F.2d 833 (6th Cir. 1963).
 We hold that in this group of family controlled corporations, having the same officers, the merger of the decree-named defendant Ocala, one wholly-owned subsidiary, into Gulf, another wholly-owned subsidiary, practically without assets except the franchise, which the record indicates derived from the parent corporation, brings Gulf within the operative force of the decree with respect to its conduct of the gas business, whether butane-propane or natural, and with respect to the handling of LP gas and appliances, both at Ocala, Florida, and at Panama City, Florida. We hold further that Mr. H. M. Lewis, President of all corporations here concerned, having full knowledge of the decree, and West Florida Gas, likewise having full knowledge of the decree, and having actually participated in the alleged violation thereof by serving as employer of Gulf Panama's employees, are answerable for contempt, if contempt be proved, under the familiar principle of law stated in Wilson v. U. S., 221 U.S. 361, 376, 31 S.Ct. 538, 543, 55 L.Ed. 771, 776, as follows:
 "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt." See also N.L.R.B. v. Hopwood Retinning Co., 104 F.2d 302, 305 (2d Cir. 1939).
 We reject Appellees' contention that inasmuch as the decree refers to employees engaged in commerce "and" in the production of goods for commerce, there can be no contempt except with respect to an employee who happens to be engaged both in commerce and in the production of goods for commerce. Obviously, the use of the conjunctive in the complaint and in the decree simply reflect the Secretary's contention that Ocala had some employees engaged in commerce and some employees engaged in the production of goods for commerce. Since engagement in either type activity is sufficient to invoke the Act's coverage, there could be no purpose in restricting the force of the injunction to employees engaged in both activities. In this decree the word "and" has the same meaning as if it were "or." In so construing this conjunctive once before, this court said: "[T]he word `and' is not a word with a single meaning, for chameleonlike, it takes its color from its surroundings." Peacock v. Lubbock Compress Company, 252 F.2d 892, 893 (5th Cir. 1958).
 We follow the District Court in its rejection of Appellees' contention that they cannot be called to account in this civil contempt proceedings for violations occurring more than two years prior to the filing of the contempt petition. Section 6 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 255, does not apply to this proceeding. In Tobin v. Frost-Arnett, supra, the District Court said:
 "Since this is not a new cause of action but a further step in the original proceeding herein to enforce an equitable remedy for civil contempt, growing out of defendant's noncompliance with the Court's original decree, the employees herein are entitled to be compensated for the periods set out in the petition, irrespective of any limitations fixed by the Portal-to-Portal Act of 1947."
 The filing of a civil contempt petition is not to be regarded as the institution of an independent proceeding but as a part of the original cause. See Leman v. Krentler-Arnold Hinge Last Co., 284 U. S. 448, 452, 52 S.Ct. 238, 76 L.Ed. 389, 394 (1932); Gompers v. Buck's Stove & R. Co., 221 U.S. 418, 444-445, 31 S.Ct. 492, 55 L.Ed. 797, 807 (1911); McComb v. Jacksonville Paper Company, supra, 336 U.S. at 192, 69 S.Ct. 497, 93 L.Ed. 599.
 Accordingly, we reverse and remand for the determination of coverage and applicability of any exemption claimed and for the determination of other issues left open by this appeal.
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 The decree was in pertinent part as follows:
 "Ordered, Adjudged and Decreed that the defendant, its agents, servants, employees and all persons acting, or claiming to act, in its behalf and interest, be, and they hereby are, permanently enjoined and restrained from violating the provisions of Sections 15(a) (2) and 15 (a) (5) of the Fair Labor Standards Act of 1938, as amended (52 Stat. 1060, as amended, 29 U.S.C., 201, et seq.), hereinafter referred to as the Act, in any of the following respects:
 "(1) The defendant shall not, contrary to Section 6 of the Act, pay any of its employees engaged in commerce and in the production of goods for commerce, as defined by the Act, wages at rates less than one dollar ($1.00) an hour, or any wages at rates less than those which may hereafter be established as the applicable minimum by any amendment of the Act.
 "(2) The defendant shall not, contrary to Section 7 of the Act, employ any of its employees engaged in commerce and in the production of goods for commerce, as defined by the Act, for a workweek longer than forty (40) hours unless the employee receives compensation for his employment in excess of forty (40) hours at a rate not less than one and one-half times the regular rate at which he is employed.
 "(3) The defendant shall not fail to make, keep and preserve records of its employees and of the wages, hours and other conditions and practices of employment maintained by it, as prescribed by the regulations of the Administrator issued, and from time to time amended, pursuant to Section 11(c) of the Act and found in Title 29, Chapter V, Code of Federal Regulations, Part 516."
 
 
 [2]
 Gulf is another wholly-owned subsidiary of West Florida Gas, having the same officers as Ocala, including Mr. Lewis as President. Originally, Gulf was known as Consolidated Natural Gas Company, having been organized on March 19, 1959, and having changed its name on June 25, 1959. Prior to the merger with Ocala, Consolidated Natural Gas Company was vested with a franchise for the purpose of operating a natural gas pipeline system in Panama City, Florida. It had no other material assets and had not engaged in any business. The record indicates that this franchise was obtained initially by West Florida Gas and was by it assigned to Consolidated Natural Gas Company
 
 
 [3]
 Ocala had been carrying its gas system at a low book value of approximately $100,000.00. The system had been appraised at $632,207.00. Ocala's book value, together with that of Consolidated Natural Gas Company, later Gulf, was not sufficient to justify a loan of $1,500,000.00. In order to reflect the true and correct value of the Ocala gas system and to satisfy the requirements of potential lenders, it was determined that the device of merger of Ocala into Gulf was advisable. Gulf could issue its stock in return for Ocala's assets based upon their appraised value and then reflect these assets on its books at such higher valuation
 
 
 [4]
 All LP gas is received and stored by West Florida Gas in large storage tanks in Panama City and from there it is sent to the outlying subsidiaries, except Gulf Ocala. Also, the gas appliances sold by the subsidiaries are first received at the central warehouse from their out of state sources and then distributed, except as to Gulf Ocala
 
 
 [5]
 In Mitchell v. Ballenger Paving Company, 299 F.2d 297, 300 (5th Cir. 1952), this court said: "As the years pass by and the Act and its coverage become more and more a part of employer-employee relations, we find it more frequently necessary to direct the entry of a decree of injunction on such appeals than has heretofore been the case."
 
 
 [6]
 To the extent that the case of Nasif v. United States, 165 F.2d 119 (5th Cir. 1947) stands for a more restricted view, it must, with respect to the use of injunctions in Fair Labor Standards Act cases, yield to McComb v. Jacksonville Paper Company, supra. See Annot., 93 L.Ed. 608
 
 
 [7]
 On December 29, 1961, West Florida Natural Gas Company, by H. M. Lewis, President, wrote a letter to the United States Department of Labor, in part as follows:
 "It was on this basis and for these reasons that the James P. Mitchell v. The Ocala Gas Company matter was settled and with the understanding that since we were converting that Company to natural gas, we agreed that it would be liable; that it was a utility and that we would adhere to the Wage and Hour Laws in the future for the Ocala Company.
 "Your people were made aware at that time that we held a Franchise to install a natural gas system in the City of Panama City and that it was our intentions to contract for the installation of the gas system and upon completion thereof it was our further intent to operate the natural gas system in Panama City using some of the employees of West Florida Natural Gas Company, both in the natural gas operation and in the LP gas operation. We further advised your people that if and when the construction [sic] period was over and we actually went into a joint natural gas-LP operation in Panama City, that we would bring all of the personnel, both LP gas and Natural under the Wage and Hour provisions. The first natural gas was turned into the system in February of 1960 to a line running to Tyndall Air Force Base. The actual construction of the initial system in Panama City was not completed until May of 1960 and the first full year of operation of a utility was completed June 30, 1961."
 
 
 [8]
 Other construction cases are Mitchell v. Ballenger Paving Company, supra; Mitchell v. Blanchard, 272 F.2d 574, (5th Cir. 1959); Mitchell v. Southwest Engineering Company, supra; Compania De Ingenieros Y Contratistas, Inc. v. Goldberg, 289 F.2d 78, 81 (1st Cir. 1961)