Ray MARSHALL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

GEORGIA SOUTHWESTERN COLLEGE, Scott Candler, Jr., Rufus R. Coody, Erwin A. Friedman, Charles A. Harris, Jesse Hill, Jr., Torbitt O. Ivey, Jr., Milton Jones, James D. Maddox, Eldridge W. McMillan, Charles T. Oxford, Lamar R. Plunkett, John H. Robinson, III, P. Bobby Smith, David Tisinger, Carey Williams, as Members, Board of Regents of the University System of Georgia, and the State of Georgia, Defendants.

Civ. A. No. 78-4-AMER.

United States District Court, M. D. Georgia, Americus Division.

May 14, 1980.

Carin Ann Clauss, Sol. of Labor, Washington, D. C., Bobbye D. Spears, Regional Sol., George D. Palmer, Associate Regional Sol., Murray A. Battles, Debra H. Green, U. S. Dept. of Labor, Birmingham, Ala., for plaintiff.

Arthur K. Bolton, Atty. Gen., George P. Shingler, Asst. Atty. Gen., Atlanta, Ga., for defendants.

OWENS, Chief Judge:

The Secretary of Labor under the provision of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (hereinafter Act or Equal Pay Act), alleges that defendant Georgia Southwestern College (hereinafter College), and defendant Board of Regents of the University System of Georgia (hereinafter Regents) have failed to comply with Section 6(d) of the Act, to wit:

No employer having employees subject to any provisions of this section *shall discriminate*, within any establishment in which such employees are employed, *between employees on the basis of sex* by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment *for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed un-*

*der similar working conditions*, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee. (Title 29 § 206(d)(1)); (emphasis added);

by paying female faculty members less than male faculty members for "equal work on jobs the performance of which requires equal skill, effort and responsibility . . ," and asks for permanent injunctive relief, back wages for three years prior to the institution of this action on February 16, 1978, and costs of the action. Defendants have denied any violation of the Equal Pay Act and have contended that the positions occupied by certain male faculty members compared by plaintiff with the female faculty members on whose behalf plaintiff is asserting claims for back wages are not equal and require greater skill, effort and responsibility than the positions occupied by those female faculty members; defendants further contend that any disparities that may be found are based on factors other than sex, including a merit system for evaluating the performance of faculty members. After a five day trial, the court now makes the following findings of fact and conclusions of law, in accordance with Rule 52, Federal Rules of Civil Procedure.

1. Albany State College at Albany, Armstrong State College at Savannah, Augusta College at Augusta, Columbus College at Columbus, Fort Valley State College at Fort Valley, Georgia College at Milledgeville, Georgia Southern College at Statesboro, Georgia Southwestern College at Americus, Kennesaw College at Marietta, North Georgia College at Dahlonega, Savannah State College at Savannah, Valdosta State College at Valdosta, West Georgia College at Carrollton, Abraham Baldwin College at Tifton, Albany Junior College at Albany, Atlanta Junior College at Atlanta, Bainbridge Junior College at Bainbridge, Brunswick Junior College at Brunswick, Clayton Junior College at Morrow, Dalton Junior College at Dalton, Emanuel

Defendant Georgia Southwestern College is a four-year state college located at Americus, Georgia. It is one of thirty-two state institutions [1] of higher learning located throughout the state. Defendant Board of Regents of the University System of Georgia is constitutionally [2] empowered to govern, control and manage each of Georgia's institutions of higher learning. The named individual defendants are the current members of the Board of Regents.

The defendant Board of Regents and its defendant institution on June 23, 1972, became subject to the Equal Pay Act, 29 U.S.C. § 206(d)(1).[3]

After the defendants became subject to the Equal Pay Act, the Department of Labor in 1972 found equal pay violations among custodial workers employed at Georgia Southwestern College, and the Regents and the defendant College agreed to pay the back wages alleged to be due.

In 1974–75 an investigation of professional, executive and administrative employees was begun and in 1975–76 that investigation focused on the Business Administration Division. From that investigation this lawsuit resulted.

The Board of Regents has divided its thirty-two institutions into three groups or classes—Class I includes the Georgia Institute of Technology, Georgia State University, the University of Georgia, and Medical College of Georgia; Class II includes Georgia SOuthwestern College and the eleven other four-year colleges; and Class III includes the sixteen junior colleges.

County Junior College at Swainsboro, Floyd Junior College at Rome, Gainesville Junior College at Gainesville, Gordon Junior College at Barnesville, Macon Junior College at Macon, Middle Georgia College at Cochran, South Georgia College at Douglas, Waycross Junior College at Waycross, Georgia Institute of Technology at Atlanta, Georgia State University at Atlanta, Medical College of Georgia at Augusta, and University of Georgia at Athens.

2. Georgia Constitution of 1976, Art. VIII, § IV, ' I, Ga.Code Ann. § 2–5201; Ga.Code Ann. § 32–115.

3. See pp. 1323–1324 of this opinion for text of the Act.

All academic and administrative personnel of the various institutions are employed, compensated and subject to discipline and dismissal by the Board of Regents, Ga.Code Ann. §§ 32–115–116, 121. While each employed person teaches or works at a particular institution, the Board of Regents, rather than the particular institution, is the "employer", and its institutions collectively are an "enterprise" as those terms are defined by the Act, 29 U.S.C. § 203(d).

The legislature of Georgia annually appropriates money to the Board of Regents to operate all institutions, and the Regents then allocate those funds among its institutions. In making allocations the Regents establish an average faculty salary each year,[4] multiply that amount by the number of faculty member slots at the institution and allocate the resulting total to the institution. The institution then divides its total among its faculty members subject only to any Regents required across the board percentage increases. The evidence shows that department heads and senior professors receive more than the average faculty salary and that as a necessary result junior faculty members receive less than the average faculty salary.

Neither the Board of Regents nor this institution has any type of merit system for classifying teaching positions and determining entering salaries or periodic increases in salaries for its faculty members. By merit system the court means something similar to the State of Georgia's merit system and to the United States Civil Service System of establishing salary grades plus step increases within grades; determining duties and qualifications for every teaching position; assigning every position a beginning salary grade; and providing for step and grade increases to be awarded as the result of time in grade, superior performance or increased qualifications.

Georgia Southwestern College as of August 29, 1978, was divided into the following academic divisions:[5] Business Administration, Education, English and Humanities, Nursing, Physical Education, Biological Sciences, Mathematics, Physical Sciences, Social Science, Psychology, Special Studies, Continuing Education, and Library.

With the exception of three academic division chairmen, the registrars, librarian, Dean of Women, and three counselors, all administrative personnel positions at this college are held by men. Not only are female division chairman- on an average paid less than men as shown in footnote 5—but two female chairmen—Nursing and Special Studies—are specifically paid less than their male counterparts.

Approximately 125 members of the faculty are engaged in teaching. The teaching staff is ranked as follows: (1) instructors; (2) assistant professors; (3) associate professors; and (4) professors; both males and females are hired and/or promoted into each of these teaching ranks. While the court heard testimony suggesting that academic rank is unrelated to salary, the defendant college's own Divisional Personnel Services Analysis (Defendant's Exh. 34) and information prepared by the college for the American Association of University Professors show clearly that the higher ranking positions are the higher paid slots. These reports also show that even in lower ranking positions, men generally receive higher salaries than women and that males are

---

4. Defendants' Exhibit 34 shows faculty salary averages set by the Board of Regents as follows:

| Fiscal Year | | |
|---|---|---|
| | 1970 | $11,000.00 |
| | 1971 | 11,392.00 |
| | 1972 | 11,400.00 |
| | 1973 | 12,255.00 |
| | 1974 | 12,875.00 |
| | 1975 | 13,548.00 |
| | 1976 | - no average set - |
| | 1977 | 14,175.00 |
| | 1978 | 15,522.00 |
| | 1979 | 17,074.00 |

5. Division chairmen have the same general duties, normally hold the rank of Professor and usually have a doctorate. They each receive 12-month salary contracts whereas most faculty members receive 9-month salary contracts. There are 8 male and 5 female division chairmen. For fiscal 1979 the average male division chairman's salary was some $4,372.00 more than the average female division chairman's salary.

concentrated in the higher ranking positions.

As seems to be the situation with the Regents and all of its institutions, the hiring of new faculty members begins with the chairman of the division in which there is a vacancy, recruiting in whatever manner he deems best. The Regents do not have a central personnel office to which persons desiring employment at its institutions may apply and from which its institutions may then secure the names of interested persons. Further the Regents have no procedure for faculty members already employed at one of its institutions to indicate an interest in transferring into a vacancy at another of its institutions. Vacancies are not posted or advertised in a uniform manner. New faculty members are located through personal contacts, professional societies, ads in professional journals, applications received at the institution and myriad other ways. While the Board of Regents is the employer and is responsible for hiring, compensating, and firing and while the Regents have adopted policies suggesting that the Presidents of each institution should not make a commitment to a new teacher without having communicated with the Chancellor as the chief operating officer of the system, the evidence shows that personnel decisions of Georgia Southwestern College are routinely approved by the Chancellor and the Chancellor's concurrence is therefore just a "rubber stamp" of the institution's decision. There being no set salary scales for faculty members, the salary for each new member is as agreed upon between the institution and the new member. The maximum amount the institution can pay is of course determined by what the institution after receiving its average faculty salary has budgeted for the particular faculty slot that is vacant. The amount the new faculty member actually receives is a matter of agreement between the institution represented by the division chairman and the new member. Asked to explain how the amount is really determined, the defendants stated that supply and demand are the real determining factors. There being a greater supply of prospective female faculty members and a willingness of females to accept lower beginning salaries, women generally are paid less of a beginning salary than men are paid for comparable positions. Since annual salary increases are computed as a percentage of current salary, women generally continue to be paid less than their male counterparts.

Note the case of Dr. Jacqueline McKinney. Dr. McKinney, like the other female members of the Business Department, was hired at a salary lower than that of comparable male teachers. After the initiation of the investigation which resulted in this litigation, Dr. McKinney received a twenty-two percent increase in one year. Her department chairman, Dr. Greene, in a memo to Dean Johnson related that the dollar figure represented by the 22% increase would still put her only $100 ahead of Mr. Jerry M. Rowland, who had failed to complete his doctoral work, and would probably suffice if the department was investigated by a government agency. This disparity between male and female salaries occurs throughout the Business Department. For instance, despite percentage increases given all faculty members, Mr. Jasper Maloy and Mr. Jerry Rowland, who were characterized as the two weakest teachers in the department, were significantly ahead of the females until after the investigation which resulted in this litigation.

Neither the Board of Regents nor the defendant college pay faculty members teaching academic subject on the basis of the particular subject taught. The defendants do not contend that it is more difficult to teach one particular academic subject than it is another and further do not contend that subject matter difficulty is a basis of pay differential. As between men and women teaching academic subjects, the defendants do not suggest that the skill, effort, and responsibility of women faculty members is other than equal to that of men. Indeed, defendants' witnesses Doctors Lawrence and Baxter admitted that the skill, effort, and responsibility of academic teaching is the same for men and women. This is consistent with the evidence which shows the responsibility of all academic teaching faculty members is to impart knowledge of

a particular subject to their students. To fulfill their responsibility each faculty member must study and prepare for class presentation; lecture and present his subject in an interesting challenging manner; engage in class discussions; prepare tests and exams that fairly cover the subject taught; promptly grade tests and exams; and maintain regular office hours for student consultation and assistance. Mentally and physically the effort required of all teaching faculty members is substantially the same.

The amount of time spent on research is also not a basis for salary differential.

The Secretary contends that not only does the institution's overall subjective system which results in men generally being paid more than women at all levels of this institution violate the Act, but also that the Act is violated in six specific instances in which female faculty members have been paid less than their male counterparts. The six female faculty members are:

1. *Dr. Jacqueline McKinney*—Dr. McKinney is an Assistant Professor of Business Education. She teaches such courses as business law, typing, shorthand, business communications, secretarial accounting, and office management. She came to Georgia Southwestern in 1967 with six years experience teaching high school, two years teaching vocational school and one year part-time at Georgia Southwestern College. She obtained her Doctorate of Education (Ed. D.) in 1975 and is considered to be a good teacher.

2. *Ora Jane Sawyer*—Ms. Sawyer has been employed at Georgia Southwestern College since 1961. She holds the position of Assistant Professor and since 1976 has been the Director of the Cooperative Program. When she was teaching, she taught typing, shorthand, transcription, business communications, and some graduate courses. Ms. Sawyer has an Ed. S. degree which is the equivalent of a doctorate degree but for a thesis.

3. *Winona Sisk*—Ms. Sisk is an Assistant Professor of Business Administration and teaches business law, insurance, real estate, marketing management, sales management, and principles of transportation. She came to Georgia Southwestern College in 1963 and received her M. Ed. in 1966. She has one year of study toward her doctorate. Her experience includes six years of public school teaching before coming to Georgia Southwestern.

4. *Rebecca Parks*—Ms. Parks is an Assistant Professor of Business Administration, holds an Ed. S. degree and has worked at Georgia Southwestern College since 1968. She had ten years of teaching experience on the college level before coming to Georgia Southwestern and teaches all levels of accounting.

5. *Mary Reeves*—Ms. Reeves is an instructor of physical education. She came to Georgia Southwestern College in 1974 and received her masters degree in 1976. She teaches skill courses and classroom courses. In addition to her teaching she also spends 12–14 hours per week organizing and supervising intramural sports.

6. *Leewynn Finklea*—Ms. Finklea is an Associate Professor of English and is the Director of Alumnae Affairs. She has a Masters of Education and has taught at Georgia Southwestern College since 1952.

Dr. McKinney and Ms. Sawyer, Ms. Sisk and Ms. Parks can be compared with one or more of the following males in the Business Department:

1. *Dr. Jackson M. McNeil*—Dr. McNeil taught principles of accounting, business machines, typing, shorthand, and materials and methods in business from 1968 through 1974. He received his Ed. D. shortly after coming to Georgia Southwestern and was promoted to Associate Professor in only three years. Dr. McKinney still has not been promoted to Associate Professor. Dr. McNeil had two years experience teaching in a junior college and one year teaching at the University of Mississippi. In his five years at the defendant college Dr. McNeil was paid $4,900.00 more than Dr. McKinney in 1968–69 (in which year neither had received their doctorate), $4,400.00 more in 1969–70, $4,700.00 more in 1970–71, and in 1971–72, $5,400.00 more in 1972–73, and $5,700.00 more in 1973–74. In 1976–77, the

year after Dr. McKinney received her Ph. D., she was paid $12,600.00, only $100.00 more than Dr. McNeil was paid in 1968–69 when he first came to Georgia Southwestern. He also received substantially more than Ms. Sawyer, Sisk and Parks.

2. *Dr. Clifton A. Baxter*—Dr. Baxter came to Georgia Southwestern College in 1972 with only part-time teaching experience. He obtained his Ed. D. in 1974 with a specialty in business data processing and was promoted to Associate Professor the following year. He teaches or has taught business law, business communications, accounting, introduction to computer application, Fortran IV programming and a variety of other courses. During 1973–74, at a time when neither had yet received a doctorate degree, Dr. Baxter was paid $900.00 more than Dr. McKinney. During each succeeding year each received salary increases but Dr. Baxter stayed ahead of Dr. McKinney. In 1977–78, when both held doctorates, Dr. Baxter received $3,100.00 more than Dr. McKinney. The disparity in Dr. Baxter's salary and that of Ms. Sawyer ranged from $600.00 in 1973–74 (before Dr. Baxter received his Ed. D.) to approximately $4,700.00 in 1977–78. Dr. Baxter's starting salary in 1973–74 was $1,000.00 more than Ms. Sisk's salary during that year.

3. *Jerry Rowland*—Mr. Rowland is an Assistant Professor of Business Administration who came to Georgia Southwestern College in 1970–71. His highest degree is a M.B.A. obtained in 1968; he teaches in the area of marketing and management. Mr. Rowland began at a salary of $2,100.00 to $2,200.00 greater than that of Dr. McKinney, Ms. Sisk and Ms. Sawyer, all of whom had comparable or higher degrees. In 1977–78 Mr. Rowland was paid $2,700.00 more than Ms. Sisk, and approximately $1,500.00 more than Ms. Sawyer.

4. *James Faircloth*—Mr. Faircloth is an Associate Professor and teaches all levels of accounting. He holds a Masters of Science in accounting and has received his Certified Public Accountant (CPA) license. His only teaching experience was as a graduate assistant at Florida State University; however, he does have several years experience in the practice of accounting. He began

working at Georgia Southwestern College in 1969–70 at a higher salary than Ms. Parks was then receiving. His salary has continued to exceed that of Ms. Parks by $1,500 to $3,000 through 1977–78 when both taught substantially the same courses.

5. *William Fisch*—Mr. Fisch holds a M.B.A. degree and a C.P.A. certificate. He came to Georgia Southwestern College in September 1968, left in 1971, and returned in 1976. He has no prior teaching experience, is an Assistant Professor and teaches all levels of accounting; however, he did not teach advanced accounting until the summer of 1978. Mr. Fisch has taken courses from Dr. McKinney and Ms. Sisk but has always been paid at least $1,000.00 more per year than Dr. McKinney. Since his return in 1976, Mr. Fisch has been paid $600 to $900 more per year than Ms. Parks.

While the defendants consider a C.P.A. license to be the equivalent of a terminal degree in the field of accounting, this results from Georgia Southwestern College having no hope of attracting a Ph. D. in accounting. As valuable as a C.P.A. certificate is in the business world, a C.P.A. certificate is not a degree at all but merely a licensing certificate evidencing knowledge and skill in applying the principles of accounting in accordance with the concepts of the American Society of Certified Public Accountants. The certificate is in consideration in evaluating Mr. Fisch and Mr. Faircloth for positions and salaries, but so is Ms. Parks' advanced education and teaching experience to which the defendant apparently gave little or no weight.

In the Physical Education department Ms. Reeves may be compared to Mr. Robert J. Voight who was hired as a Physical Education instructor and basketball coach in 1977–78. Mr. Voight also holds a masters degree but was paid almost $6,000.00 more than Ms. Reeves during the 1977–78 year according to plaintiff's Exhibit 1, or $400.00 more than Ms. Reeves according to defendants' Exhibit 34. Defendants attempt to justify the disparity on the ground that Mr. Voight is the basketball coach and deserves a higher salary; in doing so they overlook the fact that *all* members of the Physical

Education department are required either to coach or organize and supervise intramural sports in addition to their teaching duties. In each of her years of teaching, Ms. Reeves was paid significantly less than all of the male instructors and professors. In 1977–78 after she had received her Masters Degree and after three years of experience she was still paid significantly less than the males, most of whom also held only masters degree.

Likewise, Ms. Finklea has been paid a significantly lower salary than her male counterparts. *See* Plaintiff's Exhibit 1, and Defendants' Exhibit 34.

During the trial it was brought to the court's attention that during the time Dr. Jacqueline McKinney was making complaints to the college administration about receiving less wages than her male counterparts, her husband Dr. Max T. McKinney, then chairman of the Math Division, was requested to resign his position. The testimony showed that Dr. Greene advised Dr. Jacueline McKinney that he "didn't want to lose a neighbor" because of her complaints and that both McKinney's jobs were at stake.

Dr. Cofer, Dr. Max McKinney's superior, also confirmed the fact that Dr. Max McKinney had better "go up to the hill and make peace with Dean Johnson." After failing to make "peace" with Dean Johnson, Dr. McKinney was requested to resign his position as head of the Math Division. Dr. King, Dean Johnson and Dr. Cofer, the people in the best position to know all the circumstances of Dr. Max McKinney's resignation, were unable to respond with a satisfactory or uniform explanation of the reason for the requested resignation. Nor could they explain why if Dr. McKinney was performing unsatisfactorily, he was promoted to full professor in 1976.

It is obvious to the court that Dean Johnson's removal of Dr. Max McKinney as head of the Math Division was in direct retaliation for the complaints made by Dr. Jacqueline McKinney respecting female teachers being paid less than male teachers who performed substantially equal work in terms of skill, effort, and responsibility.

The court's considered judgment is that the extension of the Equal Pay Act to state and local government employees is a valid exercise of Congressional power under the Tenth and Fourteenth Amendments to the Constitution of the United States. See, *Marshall v. A & M Consolidated Ind. School Dist.*, 605 F.2d 186 (5th Cir. 1979); *Pearce v. Wichita County, City of Wichita Falls, Texas, Hospital*, 590 F.2d 128 (5th Cir. 1979). The Board of Regents is an "employer" within the meaning of the Act, 29 U.S.C.A. § 206(d)(1). Since the Regents have central control over all personnel in the university system, the entire system is an enterprise engaged in commerce or the production of goods for commerce within the meaning of 29 U.S.C.A. § 203(s)(5). See, *Marshall v. Dallas Ind. School Dist.*, 605 F.2d 191 (5th Cir. 1979); *Brennan v. Goose Creek Consolidated Ind. School Dist.*, 519 F.2d 53 (5th Cir. 1975).

Under the Equal Pay Act the Secretary bears the initial burden of proving "that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1, 10 (1974).

Equal work means work that is substantially equal, not necessarily identical, in all respects. Equality is to be judged not by job classification or titles, but by actual work performance entailed in a job. *Shultz v. Wheaton Glass Co.*, 421 F.2d 259 (3rd Cir. 1970), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970); *Brennan v. City Stores, Inc.*, 479 F.2d 235 (5th Cir. 1973).

The term "skill" as it relates to performance of a particular job "includes consideration of such factors as experience, training, education and ability." 29 C.F.R. § 800.125. These factors however refer "not to the experience, training, and education that a particular individual happens to possess, but to the experience, training, and education required by the job itself." 1 A. Larson, *Employment Discrimination: Sex* § 30.10; *Peltier v. City of Fargo*, 533 F.2d 374 (8th

Cir. 1976); *Katz v. School Dist. of Clayton, Missouri*, 557 F.2d 153 (8th Cir. 1977).

It [skill] must be measured in terms of the job. If an employee must have essentially the same skill in order to perform either of two jobs, the jobs will qualify under the Act as jobs the performance of which requires equal skill, even though the employee in one of the jobs may not exercise the required skill as frequently or during as much of his working time as the employee in the other job. Possession of a skill not needed to meet requirements of the job cannot be considered in making a determination regarding equality of skill. The efficiency of the employee's performance in the job is not in itself an appropriate factor to consider in evaluating skill.

29 C.F.R. § 800.125 (1979).

The Board of Regents and the defendant College established minimum education requirements for teachers. As already found, the job of teaching requires the same or similar basic functions which in turn require the same minimum level of training, experience, education, and ability irrespective of subject matter.

Likewise, the job of teaching implicates the same or similar effort and responsibility. There is no question that all teachers of academic subjects with the sole exception of physical education, work under the same conditions.

Accordingly, the Secretary has shown by a preponderance of the evidence that Dr. McKinney, Ms. Sawyer, Ms. Sisk, Ms. Parks, Ms. Reeves, and Ms. Finklea were and are being paid salaries less than salaries paid male teachers for jobs which require equal skill, effort, and responsibility and which are performed under similar working conditions. *Cf. A & M Consol. Ind. Sch. Dist., supra ; School Dist. of Clayton, Missouri, supra.*[6]

The Secretary having established *prima facie* equal pay violations, the burden of proof shifts to the defendants to show that the disparity in pay falls within one of the statutory exceptions: (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a differential based on factors other than sex. *Corning Glass Works, supra.* The defendants allege that the pay differentials were based upon a merit system and on a market force theory.

The court concludes that the defendants have failed to establish the existence of a bona fide merit system. The merit system exception "if not strictly construed against the employer, could easily 'swallow the rule'. . . . The employer must show that its 'merit system' is administered, if not formally, at least systematically and objectively." *Hodgson v. Brookhaven General Hosp.*, 436 F.2d 719, 726 (5th Cir. 1970) (citations omitted). "[S]ubjective evaluations of the employer cannot stand alone as a basis for salary discrimination based on sex." *Brennan v. Victoria Bank and Trust Co.*, 493 F.2d 896, 902 (5th Cir. 1974). Here, the merit system operated in an informal and unsystematic manner. No teachers were aware of any system and evaluations were carried out by the Dean and division heads on an *ad hoc* subjective basis. Salary and raise decisions were based on personal, and in many cases, ill-informed judgments of what an individual on his or her expertise is worth.

The defendants contend that any disparity in salaries was based on the market place concept, *i. e.*, each professor or instructor was paid what he or she was worth in the market place of higher education. They allege that they are not responsible for the realities of an open market and that it is a factor other than sex. This market force defense is not the kind of factor included within the catchall exception in the Act, especially when it appears that females have been willing to accept lower salaries than males. See, *Brennan v. Victoria Bank and Trust Co.*, 493 F.2d 896 (5th Cir. 1974); *Brennan v. City Stores, Inc.*, 479 F.2d 235, n. 12 (5th Cir. 1973); *Hodgson v. Brookhaven General Hosp.*, 436

---

6. In each of these cases the courts reached the conclusion that male and female grade school teachers performed work that was equal in skill, effort, and responsibility.

F.2d 719 (5th Cir. 1970). Furthermore, any credibility that the market force defense might have is diminished by the fact that those charged with hiring did not inform themselves of the market rates of particular expertise, experience or skills. The hiring process is devoid of any bargaining over initial salaries, a process one would normally expect in the context of a competing market place.

With respect to the retaliation taken against Dr. Max McKinney for his wife's complaints about salary disparities, the court notes that it is unlawful for any person:

(3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C.A. § 215(a)(3).

Although this situation is unusual in that the spouse of one who complains and not the complainant herself is being discriminated against, Dr. Max McKinney's position is protected by § 215(a)(3) to the same extent that his wife's position is protected. Otherwise the purposes of the statute could be subverted through indirect retaliations with impunity. Congress obviously did not so intend. The defendants have discriminated against Dr. Max McKinney because his wife, Dr. Jacqueline McKinney, caused this equal pay action to be instituted.

## REMEDIES

While the court is not now prepared to fashion the remedies for the proven violations, it does contemplate back pay and injunctive relief as two remedies. Normally back pay is recoverable for only two years prior to commencement of the action; however, if the equal pay violation is wilfull, back pay may be recovered for three years. 29 U.S.C.A. § 255(a). A violation is wilfull if the employer knows or has reason to know that his conduct is governed by the Act. See, *Brennan v. Heard*, 491 F.2d 1

(5th Cir. 1974); *Brennan v. J. M. Fields*, 488 F.2d 443 (5th Cir. 1973). The court has found that the defendants knew of the Equal Pay Act since 1972 when their custodial employees were investigated and they knew that the Act applied to professional employees at least since 1974—the first investigation. The defendants have wilfully violated that Act, and a three-year statute of limitations will therefore apply to back pay awards.

Since the Board of Regents has the central control of employees in the entire university system and since there is evidence that equal pay violations extend beyond Georgia Southwestern College to other institutions in the system, the court is inclined to apply injunctive relief system wide in order that complete justice can be served. See, *Brennan v. J. M. Fields*, 488 F.2d 443 (5th Cir. 1974); *Wirtz v. Ocala Gas Co.*, 336 F.2d 236 (5th Cir. 1964).

IT IS THEREFORE ORDERED that the Secretary prepare a suggested plan for appropriate remedies for the violations within thirty (30) days from the date of this order. Thereafter the defendants have ten (10) days in which to object or otherwise respond to the Secretary's proposals. The court will thereupon enter a final judgment on liability and relief.